UNITED STATES *v.* SHARPE ET AL.

No. 83–529.   Argued November 27, 1984—Decided March 20, 1985

676

Burger, C. J., delivered the opinion of the Court, in which White, Blackmun, Powell, Rehnquist, and O'Connor, JJ., joined. Blackmun, J., filed a concurring opinion, *post*, p. 688. Marshall, J., filed an opinion concurring in the judgment, *post*, p. 688. Brennan, J., *post*, p. 702, and Stevens, J., *post*, p. 721, filed dissenting opinions.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott, Elliott Schulder,* and *Patty Merkamp Stemler.*

*Mark J. Kadish,* by invitation of the Court, 469 U. S. 809, argued the cause and filed a brief as *amicus curiae* in support of the judgment below.

Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to decide whether an individual reasonably suspected of engaging in criminal activity may be

detained for a period of 20 minutes, when the detention is necessary for law enforcement officers to conduct a limited investigation of the suspected criminal activity.

# I

## A

On the morning of June 9, 1978, Agent Cooke of the Drug Enforcement Administration (DEA) was on patrol in an unmarked vehicle on a coastal road near Sunset Beach, North Carolina, an area under surveillance for suspected drug trafficking. At approximately 6:30 a. m., Cooke noticed a blue pickup truck with an attached camper shell traveling on the highway in tandem with a blue Pontiac Bonneville. Respondent Savage was driving the pickup, and respondent Sharpe was driving the Pontiac. The Pontiac also carried a passenger, Davis, the charges against whom were later dropped. Observing that the truck was riding low in the rear and that the camper did not bounce or sway appreciably when the truck drove over bumps or around curves, Agent Cooke concluded that it was heavily loaded. A quilted material covered the rear and side windows of the camper.

Cooke's suspicions were sufficiently aroused to follow the two vehicles for approximately 20 miles as they proceeded south into South Carolina. He then decided to make an "investigative stop" and radioed the State Highway Patrol for assistance. Officer Thrasher, driving a marked patrol car, responded to the call. Almost immediately after Thrasher caught up with the procession, the Pontiac and the pickup turned off the highway and onto a campground road.[1] Cooke and Thrasher followed the two vehicles as the latter drove along the road at 55 to 60 miles an hour, exceeding the speed limit of 35 miles an hour. The road eventually looped back to

---

[1] Officer Thrasher testified that the respondents' vehicles turned off the highway "[a]bout one minute" after he joined the procession. 4 Record 141.

the highway, onto which Savage and Sharpe turned and continued to drive south.

At this point, all four vehicles were in the middle lane of the three right-hand lanes of the highway. Agent Cooke asked Officer Thrasher to signal both vehicles to stop. Thrasher pulled alongside the Pontiac, which was in the lead, turned on his flashing light, and motioned for the driver of the Pontiac to stop. As Sharpe moved the Pontiac into the right lane, the pickup truck cut between the Pontiac and Thrasher's patrol car, nearly hitting the patrol car, and continued down the highway. Thrasher pursued the truck while Cooke pulled up behind the Pontiac.

Cooke approached the Pontiac and identified himself. He requested identification, and Sharpe produced a Georgia driver's license bearing the name of Raymond J. Pavlovich. Cooke then attempted to radio Thrasher to determine whether he had been successful in stopping the pickup truck, but he was unable to make contact for several minutes, apparently because Thrasher was not in his patrol car. Cooke radioed the local police for assistance, and two officers from the Myrtle Beach Police Department arrived about 10 minutes later. Asking the two officers to "maintain the situation," Cooke left to join Thrasher.

In the meantime, Thrasher had stopped the pickup truck about one-half mile down the road. After stopping the truck, Thrasher had approached it with his revolver drawn, ordered the driver, Savage, to get out and assume a "spread eagled" position against the side of the truck, and patted him down. Thrasher then holstered his gun and asked Savage for his driver's license and the truck's vehicle registration. Savage produced his own Florida driver's license and a bill of sale for the truck bearing the name of Pavlovich. In response to questions from Thrasher concerning the ownership of the truck, Savage said that the truck belonged to a friend and that he was taking it to have its shock absorbers repaired. When Thrasher told Savage that he would be held

until the arrival of Cooke, whom Thrasher identified as a DEA agent, Savage became nervous, said that he wanted to leave, and requested the return of his driver's license. Thrasher replied that Savage was not free to leave at that time.

Agent Cooke arrived at the scene approximately 15 minutes after the truck had been stopped. Thrasher handed Cooke Savage's license and the bill of sale for the truck; Cooke noted that the bill of sale bore the same name as Sharpe's license. Cooke identified himself to Savage as a DEA agent and said that he thought the truck was loaded with marihuana. Cooke twice sought permission to search the camper, but Savage declined to give it, explaining that he was not the owner of the truck. Cooke then stepped on the rear of the truck and, observing that it did not sink any lower, confirmed his suspicion that it was probably overloaded. He put his nose against the rear window, which was covered from the inside, and reported that he could smell marihuana. Without seeking Savage's permission, Cooke removed the keys from the ignition, opened the rear of the camper, and observed a large number of burlap-wrapped bales resembling bales of marihuana that Cooke had seen in previous investigations. Agent Cooke then placed Savage under arrest and left him with Thrasher.

Cooke returned to the Pontiac and arrested Sharpe and Davis. Approximately 30 to 40 minutes had elapsed between the time Cooke stopped the Pontiac and the time he returned to arrest Sharpe and Davis. Cooke assembled the various parties and vehicles and led them to the Myrtle Beach police station. That evening, DEA agents took the truck to the Federal Building in Charleston, South Carolina. Several days later, Cooke supervised the unloading of the truck, which contained 43 bales weighing a total of 2,629 pounds. Acting without a search warrant, Cooke had eight randomly selected bales opened and sampled. Chemical tests showed that the samples were marihuana.

## B

Sharpe and Savage were charged with possession of a controlled substance with intent to distribute it in violation of 21 U. S. C. § 841(a)(1) and 18 U. S. C. § 2. The United States District Court for the District of South Carolina denied respondents' motion to suppress the contraband, and respondents were convicted.

A divided panel of the Court of Appeals for the Fourth Circuit reversed the convictions. *Sharpe* v. *United States,* 660 F. 2d 967 (1981). The majority assumed that Cooke "had an articulable and reasonable suspicion that Sharpe and Savage were engaged in marijuana trafficking when he and Thrasher stopped the Pontiac and the truck." *Id.,* at 970. But the court held the investigative stops unlawful because they "failed to meet the requirement of brevity" thought to govern detentions on less than probable cause. *Ibid.* Basing its decision solely on the duration of the respondents' detentions, the majority concluded that "the length of the detentions effectively transformed them into de facto arrests without bases in probable cause, unreasonable seizures under the Fourth Amendment." *Ibid.* The majority then determined that the samples of marihuana should have been suppressed as the fruit of respondents' unlawful seizures. *Id.,* at 971. As an alternative basis for its decision, the majority held that the warrantless search of the bales taken from the pickup violated *Robbins* v. *California,* 453 U. S. 420 (1981). Judge Russell dissented as to both grounds of the majority's decision.

The Government petitioned for certiorari, asking this Court to review both of the alternative grounds held by the Court of Appeals to justify suppression. We granted the petition, vacated the judgment of the Court of Appeals, and remanded the case for further consideration in the light of the intervening decision in *United States* v. *Ross,* 456 U. S. 798 (1982). *United States* v. *Sharpe,* 457 U. S. 1127 (1982).

On remand, a divided panel of the Court of Appeals again reversed the convictions. 712 F. 2d 65 (1983). The majority concluded that, in the light of *Ross*, it was required to "disavow" its alternative holding disapproving the warrantless search of the marihuana bales. But, "[f]inding that *Ross* does not adversely affect our primary holding" that the detentions of the two defendants constituted illegal seizures, the court readopted the prior opinion as modified. *Ibid.* The majority declined "to reexamine our principal holding or to reargue the same issues that were addressed in detail in the original majority and dissenting opinions," reasoning that its action complied with this Court's mandate. The panel assumed that "[h]ad [this] Court felt that a reversal was in order, it could and would have said so." *Id.*, at 65, n. 1. Judge Russell again dissented.

We granted certiorari, 467 U. S. 1250 (1984), and we reverse.[2]

---

[2] We granted certiorari on June 18, 1984. On August 27, counsel for respondents notified the Court that respondents had become fugitives. On October 1, we directed counsel for respondents to file a brief as *amicus curiae* in support of affirmance of the Court of Appeals' judgment. Because our reversal of the Court of Appeals' judgment may lead to the reinstatement of respondents' convictions, respondents' fugitive status does not render this case moot. See *United States* v. *Villamonte-Marquez*, 462 U. S. 579, 581–582, n. 2 (1983); *Molinaro* v. *New Jersey*, 396 U. S. 365, 366 (1970) *(per curiam)*.

JUSTICE STEVENS would have this Court adopt a rule that, whenever a respondent or appellee before the Court becomes a fugitive before we render a decision, we must vacate the judgment under review and remand with directions to dismiss the appeal. This theory is not supported by our precedents, and indeed would be a break with a recent decision. The line of authority upon which the dissent relies concerns the situation in which a fugitive defendant is the party seeking review here. In those very different cases, dismissal of the petition or appeal is based on the equitable principle that a fugitive from justice is "disentitled" to call upon this Court for a review of his conviction. See *United States* v. *Campos-Serrano*, 404 U. S. 293, 294–295, n. 2 (1971); *Molinaro, supra*, at 366; see also *Estelle* v. *Dorrough*, 420 U. S. 534, 541–542 (1975) *(per curiam)*. This equitable

## II

### A

The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures. The authority and limits of the Amendment apply to investigative stops of vehicles such as occurred here. *United States* v. *Hensley*, 469 U. S. 221, 226 (1985); *United States* v. *Cortez*, 449 U. S. 411, 417 (1981); *Delaware* v. *Prouse*, 440 U. S. 648, 663 (1979); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878, 880 (1975). In *Terry* v. *Ohio*, 392 U. S. 1 (1968), we adopted a dual inquiry for evaluating the reasonableness of an investigative stop. Under this approach, we examine

"whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*, at 20.

As to the first part of this inquiry, the Court of Appeals assumed that the police had an articulable and reasonable suspicion that Sharpe and Savage were engaged in marihuana trafficking, given the setting and all the circumstances when the police attempted to stop the Pontiac and the pickup. 660 F. 2d, at 970. That assumption is abundantly supported by the record.[3] As to the second part of the in-

principle is wholly irrelevant when the defendant has had his conviction nullified and the government seeks review here. Thus, when confronted with precisely this situation in *Florida* v. *Rodriguez*, 469 U. S. 1 (1984) *(per curiam)*, we did not hesitate to reach and decide the merits of the case; had we thought that we should decline to reach every constitutional issue that *might* become moot, we would have denied certiorari. Cf. *Eisler* v. *United States*, 338 U. S. 189, 194 (1949) (Murphy, J., dissenting) ("That the case may become moot if a defendant does not return does not distinguish it from any other case we decide. For subsequent events may render any decision nugatory").

[3] Agent Cooke had observed the vehicles traveling in tandem for 20 miles in an area near the coast known to be frequented by drug traffickers. Cooke testified that pickup trucks with camper shells were often used to

quiry, however, the court concluded that the 30- to 40-minute detention of Sharpe and the 20-minute detention of Savage "failed to meet the [Fourth Amendment's] requirement of brevity." *Ibid.*

It is not necessary for us to decide whether the length of Sharpe's detention was unreasonable, because that detention bears no causal relation to Agent Cooke's discovery of the marihuana. The marihuana was in Savage's pickup, not in Sharpe's Pontiac; the contraband introduced at respondents' trial cannot logically be considered the "fruit" of Sharpe's detention. The only issue in this case, then, is whether it was reasonable under the circumstances facing Agent Cooke and Officer Thrasher to detain Savage, whose vehicle contained the challenged evidence, for approximately 20 minutes. We conclude that the detention of Savage clearly meets the Fourth Amendment's standard of reasonableness.

The Court of Appeals did not question the reasonableness of Officer Thrasher's or Agent Cooke's conduct during their detention of Savage. Rather, the court concluded that the length of the detention alone transformed it from a *Terry* stop into a *de facto* arrest. Counsel for respondents, as *amicus curiae*, assert that conclusion as their principal argument before this Court, relying particularly upon our decisions in *Dunaway* v. *New York*, 442 U. S. 200 (1979); *Florida* v. *Royer*, 460 U. S. 491 (1983); and *United States* v. *Place*, 462 U. S. 696 (1983). That reliance is misplaced.

In *Dunaway*, the police picked up a murder suspect from a neighbor's home and brought him to the police station, where, after being interrogated for an hour, he confessed.

transport large quantities of marihuana. App. 10. Savage's pickup truck appeared to be heavily loaded, and the windows of the camper were covered with a quilted bed-sheet material rather than curtains. Finally, both vehicles took evasive actions and started speeding as soon as Officer Thrasher began following them in his marked car. See n. 1, *supra*. Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification to stop the vehicles and pursue a limited investigation.

The State conceded that the police lacked probable cause when they picked up the suspect, but sought to justify the warrantless detention and interrogation as an investigative stop. The Court rejected this argument, concluding that the defendant's detention was "in important respects indistinguishable from a traditional arrest." 442 U. S., at 212. *Dunaway* is simply inapposite here: the Court was not concerned with the length of the defendant's detention, but with events occurring during the detention.[4]

In *Royer*, government agents stopped the defendant in an airport, seized his luggage, and took him to a small room used for questioning, where a search of the luggage revealed narcotics. The Court held that the defendant's detention constituted an arrest. See 460 U. S., at 503 (plurality opinion); *id.*, at 509 (POWELL, J., concurring); *ibid.* (BRENNAN, J., concurring in result). As in *Dunaway*, though, the focus was primarily on facts other than the duration of the defendant's detention—particularly the fact that the police confined the defendant in a small airport room for questioning.

The plurality in *Royer* did note that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." 460 U. S., at 500. The Court followed a similar approach in *Place*. In that case, law enforcement agents stopped the defendant after his arrival in an airport and seized his luggage for 90 minutes to take it to a narcotics detection dog for a "sniff test." We decided that an investigative seizure of personal property could be justified under the *Terry* doctrine, but that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." 462 U. S., at 709. However, the rationale underlying that conclusion was premised on the fact that the police knew of respondent's arrival time

---

[4] The pertinent facts relied on by the Court in *Dunaway* were that (1) the defendant was taken from a private dwelling; (2) he was transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation resulting in a confession. See 442 U. S., at 212.

for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes. "[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *Ibid.;* see also *Royer, supra,* at 500.

Here, the Court of Appeals did not conclude that the police acted less than diligently, or that they *unnecessarily* prolonged Savage's detention. *Place* and *Royer* thus provide no support for the Court of Appeals' analysis.

Admittedly, *Terry, Dunaway, Royer,* and *Place,* considered together, may in some instances create difficult linedrawing problems in distinguishing an investigative stop from a *de facto* arrest. Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," *United States* v. *Place, supra,* at 709, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *United States* v. *Hensley,* 469 U. S., at 228–229, 234–235; *Place, supra,* at 703–704, 709; *Michigan* v. *Summers,* 452 U. S. 692, 700, and n. 12 (1981) (quoting 3 W. LaFave, Search and Seizure § 9.2, pp. 36–37 (1978)). Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

We sought to make this clear in *Michigan* v. *Summers, supra:*

"If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the

individual for longer than the brief time period involved in *Terry* and *Adams* [v. *Williams*, 407 U. S. 143 (1972)]." 452 U. S., at 700, n. 12.

Later, in *Place*, we expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible *Terry* stop:

> "We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." 462 U. S., at 709, n. 10.

The Court of Appeals' decision would effectively establish a *per se* rule that a 20-minute detention is too long to be justified under the *Terry* doctrine. Such a result is clearly and fundamentally at odds with our approach in this area.

## B

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. See *Michigan* v. *Summers, supra,* at 701, n. 14 (quoting 3 W. LaFave, Search and Seizure § 9.2, p. 40 (1978)); see also *Place,* 462 U. S., at 709; *Royer,* 460 U. S., at 500. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. See generally *post,* at 712–716 (BRENNAN, J., dissenting). A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine

some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Cady* v. *Dombrowski*, 413 U. S. 433, 447 (1973); see also *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 557, n. 12 (1976). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

We readily conclude that, given the circumstances facing him, Agent Cooke pursued his investigation in a diligent and reasonable manner. During most of Savage's 20-minute detention, Cooke was attempting to contact Thrasher and enlisting the help of the local police who remained with Sharpe while Cooke left to pursue Officer Thrasher and the pickup. Once Cooke reached Officer Thrasher and Savage,[5] he proceeded expeditiously: within the space of a few minutes, he examined Savage's driver's license and the truck's bill of sale, requested (and was denied) permission to search the truck, stepped on the rear bumper and noted that the truck did not move, confirming his suspicion that it was probably overloaded. He then detected the odor of marihuana.

Clearly this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers. Respondents presented no evidence that the officers were dilatory in their investigation. The delay in this case was

---

[5] It was appropriate for Officer Thrasher to hold Savage for the brief period pending Cooke's arrival. Thrasher could not be certain that he was aware of all of the facts that had aroused Cooke's suspicions; and, as a highway patrolman, he lacked Cooke's training and experience in dealing with narcotics investigations. In this situation, it cannot realistically be said that Thrasher, a state patrolman called in to assist a federal agent in making a stop, acted unreasonably because he did not release Savage based solely on his own limited investigation of the situation and without the consent of Agent Cooke.

attributable almost entirely to the evasive actions of Savage, who sought to elude the police as Sharpe moved his Pontiac to the side of the road.[6]  Except for Savage's maneuvers, only a short and certainly permissible pre-arrest detention would likely have taken place.  The somewhat longer detention was simply the result of a "graduate[d] . . . respons[e] to the demands of [the] particular situation," *Place, supra,* at 709, n. 10.

We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE BLACKMUN, concurring.

In view of respondents' fugitive status, see *ante,* at 681–682, n. 2, I would have vacated the judgment of the Court of Appeals and remanded the case to that court with directions to dismiss the respondents' appeal from the District Court's judgment to the Court of Appeals.  See *Molinaro* v. *New Jersey,* 396 U. S. 365 (1970).

This Court, however, does not follow that path, and chooses to decide the case on the merits.  I therefore also reach the merits and join the Court's opinion.

JUSTICE MARSHALL, concurring in the judgment.

I join the result in this case because only the evasive actions of the defendants here turned what otherwise would

---

[6] Even if it could be inferred that Savage was not attempting to elude the police when he drove his car *between* Thrasher's patrol car and Sharpe's Pontiac—in the process nearly hitting the patrol car, see App. 17, 37—such an assumption would not alter our analysis or our conclusion.  The significance of Savage's actions is that, whether innocent or purposeful, they made it necessary for Thrasher and Cooke to split up, placed Thrasher and Cooke out of contact with each other, and required Cooke to enlist the assistance of local police before he could join Thrasher and Savage.

have been a permissibly brief *Terry* stop into the prolonged encounter now at issue. I write separately, however, because in my view the Court understates the importance of *Terry*'s brevity requirement to the constitutionality of *Terry* stops.

I

*Terry* v. *Ohio*, 392 U. S. 1, 27 (1968), recognized a "narrowly drawn" exception to the probable-cause requirement of the Fourth Amendment for certain seizures of the person that do not rise to the level of full arrests. Two justifications supported this "major development in Fourth Amendment jurisprudence." *Pennslyvania* v. *Mimms*, 434 U. S. 106, 115 (1977) (STEVENS, J., dissenting). First, a legitimate *Terry* stop—brief and narrowly circumscribed—was said to involve a "wholly different kind of intrusion upon individual freedom" than a traditional arrest. *Terry*, 392 U. S., at 26. Second, under some circumstances, the government's interest in preventing imminent criminal activity could be substantial enough to outweigh the still-serious privacy interests implicated by a limited *Terry* stop. *Id.*, at 27. Thus, when the intrusion on the individual is minimal, and when law enforcement interests outweigh the privacy interests infringed in a *Terry* encounter, a stop based on objectively reasonable and articulable suspicions, rather than upon probable cause, is consistent with the Fourth Amendment.[1]

---

[1] The following special law enforcement needs have been found sufficient to justify a minimally intrusive stop based on reasonable suspicion: protective weapons searches, *Terry, Adams* v. *Williams*, 407 U. S. 143 (1972); border searches for illegal aliens, *United States* v. *Cortez*, 449 U. S. 411 (1981), *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975); airport searches for suspected drug trafficking, *Florida* v. *Royer*, 460 U. S. 491 (1983), *United States* v. *Place*, 462 U. S. 696 (1983), *United States* v. *Mendenhall*, 446 U. S. 544 (1980); stops to investigate past felonies, *United States* v. *Hensley*, 469 U. S. 221 (1985). In *Royer*, we referred to stops to investigate "illegal transactions in drugs or other serious crime." 460 U. S., at 499. We have never suggested that all law enforcement objectives, such as the investigation of possessory offenses, outweigh the individual interests infringed upon. Cf. *Brinegar* v. *United States*,

That *Terry* was justified in terms of these two rationales was made clear in subsequent cases. For example, in *Dunaway* v. *New York*, 442 U. S. 200, 210 (1979), we explained that *Terry* rested on two principles:

> "First, it defined a special category of Fourth Amendment 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause . . . ."

Similarly, in *United States* v. *Place*, 462 U. S. 696, 703 (1983), the Court held that, "[w]hen the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." See also *id.*, at 704 ("The context of a particular law enforcement practice, of course, may affect the determination whether a brief intrusion on Fourth Amendment interests on less than probable cause is essential to effective criminal investigation"). Even a stop that lasts no longer than necessary to complete the investigation for which the stop was made may amount to an illegal arrest if the stop is more than "minimally intrusive." The stop must first be found not unduly intrusive before any balancing of the government's interest against the individual's becomes appropriate. See also *Michigan* v. *Summers*, 452 U. S. 692, 697–699 (1981).

---

338 U. S. 160, 183 (1949) (Jackson, J., dissenting) ("[J]udicial exceptions to the Fourth Amendment . . . should depend somewhat upon the gravity of the offense"). Respondents in this case were suspected of offloading large quantities of drugs from vessels that had recently arrived at the coast, an activity that, under *Place*, triggers sufficiently special and important law enforcement interests to justify a *Terry* stop.

To those who rank zealous law enforcement above all other values, it may be tempting to divorce *Terry* from its rationales and merge the two prongs of *Terry* into the single requirement that the police act reasonably under all the circumstances when they stop and investigate on less than probable cause. Cf. Posner, Rethinking the Fourth Amendment, 1981 S. Ct. Rev. 49, 71. As long as the police are acting diligently to complete their investigation, it is difficult to maintain that law enforcement goals would better be served by releasing an individual after a brief stop than by continuing to detain him for as long as necessary to discover whether probable cause can be established. But while the preservation of order is important to any society, the "needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 273 (1973). *Terry* must be justified, not because it makes law enforcement easier, but because a *Terry* stop does not constitute the sort of arrest that the Constitution requires be made only upon probable cause.

For this reason, in reviewing any *Terry* stop, the "critical threshold issue is the intrusiveness of the seizure." *United States* v. *Place, supra,* at 722 (BLACKMUN, J., concurring in judgment). Regardless how efficient it may be for law enforcement officials to engage in prolonged questioning to investigate a crime, or how reasonable in light of law enforcement objectives it may be to detain a suspect until various inquiries can be made and answered, a seizure that in duration, scope, or means goes beyond the bounds of *Terry* cannot be reconciled with the Fourth Amendment in the absence of probable cause. See *Dunaway, supra.* Legitimate law enforcement interests that do not rise to the level of probable cause simply cannot turn an overly intrusive seizure into a constitutionally permissible one.

In my view, the length of the stop in and of itself may make the stop sufficiently intrusive to be unjustifiable in the absence of probable cause to arrest.[2]  *Terry* "stops" are justified, in part, because they are *stops,* rather than prolonged seizures.  "[A] stopping differs from an arrest not in the incompleteness of the seizure but in the brevity of it."  1 W. LaFave & J. Israel, Criminal Procedure § 3.8, p. 297 (1984).

Consistent with the rationales that make *Terry* stops legitimate, we have recognized several times that the requirement that *Terry* stops be brief imposes an independent and *per se* limitation on the extent to which officials may seize an individual on less than probable cause.  The Court explicitly so held in *Place,* where we invalidated a search that was the product of a lengthy detention; as the Court said: "The length of the detention . . . alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. . . . [T]he 90-minute detention . . . is sufficient to render the seizure unreasonable . . . ."[3]  462 U. S., at 709–710.  See also *United States* v. *Hensley,* 469 U. S. 221, 235 (1985) ("[A] detention might well be so lengthy or intrusive as to exceed the permissible limits of a *Terry* stop"); *Florida* v. *Royer,* 460 U. S. 491, 500 (1983) ("[A]n investigative detention must be temporary . . ."); *id.,* at 510–511 (BRENNAN, J., concurring in result) ("[A]ny suggestion that the *Terry* reasonable-suspicion standard justifies anything but the briefest of detentions . . . finds no support in the *Terry* line of cases"); *Summers, supra,* at 705, n. 21

---

[2] A stop can also be unduly intrusive if the individual is moved or asked to move more than a short distance, if a search is more extensive than necessary to protect the police from an objective fear of danger, or if tactics amounting to custodial interrogation are used.  See *Dunaway* v. *New York,* 442 U. S. 200 (1979); *Kolender* v. *Lawson,* 461 U. S. 352, 365 (1983) (BRENNAN, J., concurring).

[3] The majority suggests that the 90-minute detention in *Place* was held too long only because the police had not acted diligently enough.  In my view, the statements quoted in text adequately demonstrate that the length of the detention "alone" was "sufficient" to invalidate the seizure.

(questioning legality of "prolonged" detention). A *Terry* stop valid in its inception may become unduly intrusive on personal liberty and privacy simply by lasting too long. That remains true even if valid law enforcement objectives account for the length of the seizure.

The requirement that *Terry* stops be brief no matter what the needs of law enforcement in the particular case is buttressed by several sound pragmatic considerations. First, if the police know they must structure their *Terry* encounters so as to confirm or dispel the officer's reasonable suspicion in a brief time, police practices will adapt to minimize the intrusions worked by these encounters. Cf. *United States* v. *Place, supra* (to assure brevity of *Terry* airport stops, narcotic detection dogs must, under some circumstances, be kept in same airport to which suspect is arriving). Firm adherence to the requirement that stops be brief forces law enforcement officials to take into account from the start the serious and constitutionally protected liberty and privacy interests implicated in *Terry* stops, and to alter official conduct accordingly.[4]

Second, a *per se* ban on stops that are not brief yields the sort of objective standards mandated by our Fourth Amendment precedents, standards that would avoid placing courts in the awkward position of second-guessing police as to what constitutes reasonable police practice.[5] We have recognized that the methods employed in a *Terry* stop "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida* v.

---

[4] We recognized a similar point in *Dunaway:* "A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." 442 U. S., at 213–214.

[5] Cf. *Dunaway, supra,* at 219–220 (WHITE, J., concurring) (rules defining appropriate *Terry* stops must be fashioned on categorical basis, rather than resolved "in an ad hoc, case-by-case fashion by individual police officers").

*Royer, supra,* at 500.[6]  Yet in the absence of a *per se* requirement that stops be brief, defining what means are "least intrusive" is a virtually unmanageable and unbounded task. Whether the police have acted with due diligence is a function not just of how quickly they completed their investigation, but of an almost limitless set of alternative ways in which the investigation *might* have been completed.  For example, in this case the Court posits that the officers acted with due diligence, but they might have acted with more diligence had Cooke summoned two rather than one highway patrolman to assist him, or had Cooke, who had the requisite "training and experience," stopped the pickup truck—the vehicle thought to be carrying the marihuana.  See generally *post*, at 712–716 (BRENNAN, J., dissenting).  And if due diligence takes as fixed the amount of resources a community is willing to devote to law enforcement, officials in one community may act with due diligence in holding an individual at an airport for 35 minutes while waiting for the sole narcotics detection dog they possess, while officials who have several dogs readily available may be dilatory in prolonging an airport stop to even 10 minutes.

Constitutional rights should not vary in this manner.  Yet in the absence of a brevity standard that is independent of

---

[6] At least we have until today.  The language from *Cady* v. *Dombrowski*, 413 U. S. 433, 447 (1973), quoted *ante*, at 687, to the effect that full-scale Fourth Amendment searches may be reasonable even if not accomplished in the least intrusive means is of course wholly inconsistent with the holding of *Royer*.  *Cady*, quite obviously, has nothing to do with the *Terry* stop issue here; there the question was whether a search that the Court found legitimate had to be accomplished in any particular way, while here the issue is whether the police have intruded on an individual so substantially as to need probable cause.  I assume *Royer's* holding remains the law on this point, and that the Court's mere quotation out of context of *Cady*, unsupported by any argument or reasoned discussion, is not meant to overrule *Royer*.  Legal reasoning hardly consists of finding isolated sentences in wholly different contexts and using them to overrule *sub silentio* prior holdings.

the actions or needs of the police, that variance is one of two inescapable results. The other is that the Court will have to take seriously its requirement that the police act with due diligence, which will require the Court to inject itself into such issues as whether this or that alternative investigative method ought to have been employed.[7] Cf. *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 565 (1976) (One purpose of the warrant requirement "is to prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure"). The better and judicially more manageable rule would be a *per se* requirement that *Terry* stops be brief, for that rule would avoid the Court's measuring police conduct according to a virtually standardless yardstick.

Finally, dissolving the brevity requirement into the general standard that the seizure simply be reasonable will "inevitably produce friction and resentment [among the police], for there are bound to be inconsistent and confusing decisions." Schwartz, Stop and Frisk, 58 J. Crim. L. C. & P. S. 433, 449 (1967). The police themselves may have done nothing unreasonable in holding a motorist for one hour while waiting for a registration computer to come back on line, but surely such a prolonged detention would be unlawful. Indeed, in my view, as soon as a patrolman called in and learned that the computer was down, the suspect would have to be released. That is so not because waiting for information in this circumstance is unreasonable, but simply because the stop must be brief if it is to be constitutional on less than probable cause. A "balancing" test suggests that a stop is invalid only if officials have crossed over some line they

---

[7] It is clear from the Court's distaste for the task of "second-guessing" the police, *ante*, at 686, and from JUSTICE BRENNAN's critique of the cursory way in which the Court analyzes the investigative methods employed in this case, that the Court has little intention of choosing this option and taking seriously the requirement that the police act with "due diligence." That demonstrated lack of will makes a strict brevity requirement all the more important.

should have avoided; the finding that such a "balance" has been struck improperly casts a certain moral opprobrium on official conduct. A brevity requirement makes clear that the Constitution imposes certain limitations on police powers no matter how reasonably those powers have been exercised. "[H]air-splitting distinctions that currently plague our Fourth Amendment jurisprudence" serve nobody's interest, *New York* v. *Quarles*, 467 U. S. 649, 664 (1984) (O'CONNOR, J., concurring in part and dissenting in part), but measuring the legitimacy of a *Terry* stop by the reasonableness and diligence of the official's actions, rather than by the intrusiveness of the stop, would proliferate such distinctions. Maintaining the clarity of *Terry*'s brevity requirement will instead breed respect for the law among both police and citizens.

For these reasons, fidelity to the rationales that justify *Terry* stops requires that the intrusiveness of the stop be measured independently of law enforcement needs. A stop must first be found not unduly intrusive, particularly in its length, before it is proper to consider whether law enforcement aims warrant limited investigation.

## II

We have had little occasion to specify the length to which a stop can be extended before it can no longer be justified on less than probable cause. But see *United States* v. *Place*, 462 U. S. 696 (1983) (90-minute seizure too long). In *Terry* and *Adams* v. *Williams*, 407 U. S. 143, 146 (1972), we described the stop simply as "brief." In *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 880 (1975), we upheld a "modest" stop that "usually consumed no more than a minute." *Dunaway* v. *New York*, 422 U. S. 200 (1979), *United States* v. *Martinez-Fuerte, supra,* at 558, and *United States* v. *Hensley*, 469 U. S. 221 (1985), drew upon *Terry* to characterize permissible stops as "brief" ones; *Florida* v. *Royer*, 460 U. S. 491 (1983), described a legitimate *Terry* stop as

"temporary." Those stops upheld in these cases all lasted no more than a few minutes before probable cause was established.[8]

The Court has "decline[d] to adopt any outside time limitation for a permissible *Terry* stop." *Place, supra,* at 709. While a *Terry* stop must be brief no matter what the needs of the authorities, I agree that *Terry*'s brevity requirement is not to be judged by a stopwatch but rather by the facts of particular stops. At the same time, the time it takes to "briefly stop [the] person, ask questions, or check identification," *United States* v. *Hensley, supra,* at 229, and, if warranted, to conduct a brief pat-down for weapons, see *Terry,* is typically just a few minutes. In my view, anything beyond this short period is presumptively a *de facto* arrest. That presumption can be overcome by showing that a lengthier detention was not unduly *intrusive* for some reason; as in this case, for example, the suspects, rather than the police, may have prolonged the stop.[9] It cannot, however, be overcome simply by showing that police needs required a more intrusive stop. For that reason, I regard the American Law Institute's suggested maximum of 20 minutes[10] as too long; "any suggestion that the *Terry* reasonable-suspicion standard justifies anything but the briefest of detentions or the most limited of searches finds no support in the *Terry* line of cases." *Royer, supra,* at 510–511 (BRENNAN, J., concurring in result).

---

[8] In *Michigan* v. *Summers,* 452 U. S. 692, 700, n. 12 (1981), the Court noted that, under some circumstances, a valid stop could last longer "than the brief time period involved in *Terry* and *Adams.*" As my concurrence today indicates, I agree that the length of the actual stop in *Terry* does not establish a firm outer limit beyond which no valid stop can ever go. However, nothing in the record in *Summers* revealed how long the stop there took, 452 U. S., at 711, n. 3 (Stewart, J., dissenting), and this statement from *Summers* must be read against the peculiarly unintrusive setting of a stop that took place within the defendant's own residence.

[9] See n. 11, *infra.*

[10] See ALI, Model Code of Pre-Arraignment Procedure § 110.2(1) (1975).

Difficult questions will no doubt be presented when during these few minutes an officer learns enough to increase his suspicions but not enough to establish probable cause. But whatever the proper resolution of this problem, the very least that ought to be true of *Terry*'s brevity requirement is that, if the initial encounter provides no greater grounds for suspicion than existed before the stop, the individual must be free to leave after the few minutes permitted for the initial encounter. Such a clear rule would provide officials with necessary and desirable certainty and would adequately protect the important liberty and privacy interests upon which *Terry* stops infringe.

## III

In light of these principles, I cannot join the Court's opinion. The Court offers a hodgepodge of reasons to explain why the 20-minute stop at issue here was permissible. At points we are told that the stop was no longer than "necessary" and that the police acted "diligently" in pursuing their investigation, all of which seems to suggest that, as long as a stop is no longer than necessary to the "legitimate investigation of the law enforcement officers," the stop is perfectly lawful. See *ante*, at 677, 685, 686. As I have just argued, such reasoning puts the horse before the cart by failing to focus on the critical threshold question of the intrusiveness of the stop, particularly its length. With respect to that question, the Court seems in one breath to chastise the Court of Appeals for concluding that the length of a detention alone can transform a *Terry* stop into a *de facto* arrest, see *ante*, at 680, 682–683, while in another breath the Court acknowledges that, "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Ante*, at 685.

Fortunately, it is unneccessary to try to sort all of this out, for another rationale offered by the Court adequately disposes of this case. As the Court recognizes: "The delay in this case was attributable almost entirely to the evasive actions of Savage, who sought to elude the police as Sharpe

moved his Pontiac to the side of the road. Except for Savage's maneuvers, only a short and certainly permissible pre-arrest detention would likely have taken place." *Ante*, at 687–688. With that holding I agree.[11] Had Savage pulled over when signalled to, as did Sharpe, Savage and Sharpe both would have been subjected to only a permissibly brief *Terry* stop before the odor of the marihuana would have given the officers probable cause to arrest.[12] Once Cooke caught back up with Savage, only a few minutes passed before Cooke smelled the marihuana. During these few brief minutes, Savage was subjected to no more than the identification request and minimal questioning, designed to confirm or dispel the reasonable suspicion causing the stop, that is legitimate under *Terry*. While a 20-minute stop would, under most circumstances, be longer than the limited intrusion entailed by the brief stop that *Terry* allows, I believe such a stop is permissible when a suspect's own actions are the primary cause for prolonging an encounter

---

[11] The District Court stated that the stop "took a little longer than it should have taken. They created their own problem." 4 Record 221. Immediately after making this statement, the District Court ruled the stop lawful. *Id.*, at 221–222. From the context in which the statement was made—a direct response to the Government's argument that "each case has to more or less stand on its own facts" and that here the defendants were the cause of the overly lengthy detention—I have little doubt that the "they" referred to was the defendants. Because the District Court issued no express findings of fact, this statement, like other statements relied on to define the underlying facts, must be read in the light most faithful to the context in which it was uttered.

[12] No question is presented as to whether odor that creates probable cause also justifies a warrantless search. See *Johnson* v. *United States*, 333 U. S. 10, 13 (1948) ("[O]dors alone do not authorize a search without warrant"). That issue was not decided in *United States* v. *Johns*, 469 U. S. 478, 486 (1985), for there the warrantless search was justified by the automobile exception created in *United States* v. *Ross*, 456 U. S. 798 (1982). I of course disagree with the theory of *Ross*, see *id.*, at 827 (MARSHALL, J., dissenting), but I concur in the judgment here because no question is presented as to the validity of the warrantless search and seizure of the burlap-covered bales removed from the truck driven by Savage.

beyond the bounds to which *Terry*'s brevity requirement ordinarily limits such stops. Nothing more is necessary to decide this case, and any further suggestions in the Court's opinion I find unwarranted, confusing, and potentially corrosive of the principles upon which *Terry* is grounded.

## IV

I also cannot join the Court's opinion because it reaches out to decide a wholly distinct issue not presented and not capable of being treated fairly without further development of a factual record. The Court of Appeals assumed, without deciding, that an objectively reasonable suspicion of criminal activity existed to justify these stops. The District Court, after listening to the officers explain the basis on which they purported to make the stop, and after testimony taking up 450 pages of transcript, found the legality of the initial stop to present "a real close question." App. 45. This question was not presented in the certiorari petition and not a single word is devoted to it in the briefs. Yet in what can only be construed as a thinly disguised attempt to decide the question, the Court, from its position atop the judicial system, concludes that the Court of Appeals' assumption *arguendo* that the stop was legal is "abundantly" supported by the record, *ante*, at 682—an abundance not evident to the District Court. Cf. *Anderson* v. *Bessemer City, ante,* p. 564 (district court credibility determinations entitled to strongest deference).

Of course, the proper approach to this issue is illustrated by *United States* v. *Place,* 462 U. S., at 700, n. 1, where, as here, the Court of Appeals had assumed the existence of reasonable suspicion and certiorari had not been granted on the question; the Court correctly concluded that it had "no occasion to address the issue here." *Ibid.* Consistency, however, hardly has been a hallmark of the current Court's Fourth Amendment campaigns.

Moreover, aside from the fact that the reasonable-suspicion issue was not presented, briefed, or argued by the parties,

the Court's handling of this issue reveals the defects of engaging in an airy factual inquiry unaided by full lower court review.  First, the Court ignores relevant evidence relied on by the District Court when the latter concluded that, although the question was "real close," the initial stop was lawful; for example, the Court does not refer to evidence before the District Court regarding how common it would have been for a pickup truck like that driven by Savage to be found in this area.  See Defendant's Exhibit 10.  Perhaps a stop of a particular type of truck would be reasonable in some areas and not in others, which is why evidence was submitted on the number of such trucks in this area; but in its haste to validate the actions here, the Court seems to suggest that pickup trucks with camper shells are always, anywhere items engendering reasonable suspicion.  Second, the Court makes ill-considered inferences to concoct those few facts upon which it does rely to uphold the initial stop.  The Court first asserts that both drivers "started speeding as soon as Officer Thrasher began following them in his marked car," *ante*, at 683, n. 3, and then suggests that respondents sped because they noticed Thrasher and were seeking to evade him.  Thrasher, however, had joined the caravan at least one minute before respondents began speeding.  4 Record 140–141.  In addition, respondents did not speed until they left the highway, at which point they continued at their highway speed of 55 to 60 miles an hour through a 3-mile campground road for which the posted limit was 35 miles an hour.  Any implication that respondents sped *because* they noticed Thrasher or to "evade" the officers is unsupported by common sense or by the record.  Sharpe and Savage hardly could have expected to "evade" the police on a 3-mile closed loop through a campground, and if the Court's speculation that they noticed Thrasher's car is correct, one certainly doubts they would have intentionally attracted attention to themselves by beginning to speed.  Finally, the District Court's view on the reasonable-suspicion issue may well have

been colored by the fact that "several" other of these essentially profile stops were made that morning, including stops of four or five four-wheel drive vehicles, and yet no other drug arrests were made. *Id.*, at 127–128. If after two days and 450 pages of testimony the District Court concluded that the reasonableness and articulability of the officers' suspicion presented a "close question," and if the Court today has less factual information before it and must rely on questionable inferences to elicit even those few facts upon which it does rely, one would hope the Court would act with greater restraint than to speculate whether the "assumption" of reasonable suspicion is "abundantly" supported by the record. But any such hope would evidently be merely idle fancy with respect to a Court so anxious to address an unpresented issue that it blithely hurdles over the jurisdictional and jurisprudential principles that ought to stand in its way.

## V

In my view, the record demonstrates that the lengthy stop at issue in this case would have been permissibly brief but for the respondents' efforts to evade law enforcement officials. Accordingly, I agree with the Court's judgment. But because there is no way to fathom the extent to which the majority's holding rests on this basis, and because the majority acts with unseemly haste to decide other issues not presented, I join only its judgment.

JUSTICE BRENNAN, dissenting.

The respondent William Sharpe and his passenger were pulled over to the side of the highway, concededly without probable cause, and held for more than 30 minutes, much of that time in the back seat of a police cruiser, before they ultimately were arrested and informed of the charges against them. In the meantime, the respondent Donald Savage was stopped one-half mile down the road, also according to the Court without probable cause. He was ordered out of his pickup truck at gunpoint, spread-eagled and frisked, and

questioned by the detaining patrolman, Kenneth Thrasher, about a suspected shipment of marihuana in his vehicle. Although Savage repeatedly asked to be released, Thrasher held him for almost 15 minutes until DEA Agent Luther Cooke, the officer who had stopped Sharpe back up the road, could arrive and sniff the vehicle's windows to determine whether he could smell the suspected marihuana. As Thrasher later conceded, Savage "was under custodial arrest" the entire time. 4 Record 165.

The Court today concludes that these lengthy detentions constituted reasonable investigative stops within the meaning of *Terry* v. *Ohio*, 392 U. S. 1 (1968). It explains that, although the length of an investigative stop made without probable cause may at some point become so excessive as to violate the Fourth Amendment, the primary inquiry must nevertheless be whether the investigating officers acted "diligently" in pursuing a stop that was no longer than "necessary" to the "legitimate investigation of the law enforcement officers." *Ante*, at 687. The Court reasons that *Terry*'s brevity requirement is in fact an accordion-like concept that may be expanded outward depending on "the law enforcement purposes to be served by the stop." *Ante*, at 685. Applying this analysis to the instant case, the Court concludes that the lengthy detentions of Sharpe and Savage were reasonable because the delay was the fault of Savage, whom the Court contends "sought to elude the police" by speeding away when signaled to stop; had Savage not taken these "evasive actions," Agent Cooke could have questioned Sharpe and Savage together and "only a short and certainly permissible pre-arrest detention would likely have taken place." *Ante*, at 688.

I dissent. I have previously expressed my views on the permissible scope and duration of *Terry* stops, and need not recount those views in detail today. See, *e. g.*, *United States* v. *Place*, 462 U. S. 696, 710 (1983) (BRENNAN, J., concurring in result); *Kolender* v. *Lawson*, 461 U. S. 352, 362 (1983) (BRENNAN, J., concurring); *Florida* v. *Royer*, 460

U. S. 491, 509 (1983) (BRENNAN, J., concurring in result). I write at some length, however, because I believe the Court's opinion illustrates several disturbing trends in our disposition of cases involving the rights of citizens who have been accused of crime. First, the Court increasingly tends to reach out and decide issues that are not before it. If the facts in this case are as the Court recounts them, for example, the propriety of these lengthy detentions would not appear to be governed by the *Terry* line of cases at all, and the Court's opinion is therefore little more than 13 pages of ill-considered dicta. Second, the Court of late shows increasing eagerness to make purely factual findings in the first instance where convenient to support its desired result. For example, the Court's conclusion in this case that Savage "sought to elude the police" is a *de novo* factual determination resting on a record that is ambiguous at best. Finally, the Court in criminal cases increasingly has evaded the plain requirements of our precedents where they would stand in the way of a judgment for the government. For a *Terry* stop to be upheld, for example, the government must show at a minimum that the "least intrusive means reasonably available" were used in carrying out the stop. *Florida* v. *Royer, supra,* at 500 (opinion of WHITE, J.).[1] The Government has made no such showing here, and the Court's bald assertion that "[c]learly this case does not involve any delay unnecessary" to "legitimate" law enforcement, *ante,* at 687, is completely undermined by the record before us.

## I

The Court portrays the circumstances leading up to these detentions with a studied flourish. Before Sharpe and Sav-

---

[1] Concurring in the plurality's result in *Royer,* I argued that the Fourth Amendment requires an even more stringent standard: "a lawful stop must be so strictly limited that it is difficult to conceive of a less intrusive means that would be effective to accomplish the purpose of the stop." 460 U. S., at 511, n.

age were stopped, we are told, they "took evasive actions and started speeding as soon as Officer Thrasher began following them in his marked car." *Ante*, at 683, n. 3. When the two were signaled to stop, Savage's "pickup truck cut between the Pontiac and Thrasher's patrol car, nearly hitting the patrol car, and continued down the highway." *Ante*, at 678. Savage, in other words, "sought to elude the police as Sharpe moved his Pontiac to the side of the road." *Ante*, at 688. As a result of Savage's "evasive actions" and "maneuvers," Thrasher had to chase after him and leave Agent Cooke with Sharpe, thereby laying the groundwork for the challenged delay. *Ibid.*

If the facts are as the Court relates them, it is not readily apparent why the Court insists on using this case as a vehicle for expanding the outer bounds of *Terry* investigative stops. I had thought it rather well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest. See, *e. g., Peters* v. *New York*, decided together with *Sibron* v. *New York*, 392 U. S. 40, 66–67 (1968) (companion case to *Terry*) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest"). See also *Kolender* v. *Lawson, supra*, at 366, n. 4 (BRENNAN, J., concurring) ("[S]ome reactions by individuals to a properly limited *Terry* encounter, . . . such as flight, may often provide the necessary information, in addition to that which the officers already possess, to constitute probable cause"); *Henry* v. *United States*, 361 U. S. 98, 103 (1959) (suspicious circumstances did not ripen into probable cause because defendants' "movements in the car had no mark of fleeing men or men

acting furtively"); *Husty* v. *United States*, 282 U. S. 694, 701 (1931) ("prompt attempt . . . to escape when hailed by the officers," when coupled with other suspicious evidence, ripened into probable cause).[2]

Of course, flight *alone* cannot give rise to probable cause; it must be coupled with pre-existing reasonable and articulable suspicion. See 1 W. LaFave, Search and Seizure § 3.6, p. 669 (1978).[3] And the act of flight must reasonably appear to be in response to the presence of the authorities.[4] Here,

---

[2] See generally 1 W. LaFave, Search and Seizure § 3.6, p. 669 (1978) ("[I]f there already exists a significant degree of suspicion concerning a particular person, the flight of that individual upon the approach of the police may be taken into account and may well elevate the pre-existing suspicion up to the requisite Fourth Amendment level of probable cause"). Representative federal and state cases applying this principle include *United States* v. *Martinez-Gonzalez*, 686 F. 2d 93, 100 (CA2 1982) ("The event that transformed the agents' reasonable suspicion into probable cause was Martinez's own manifestation of guilt evidenced by his flight from the agents back into the apartment when the agents approached him to talk to him"); *United States* v. *Green*, 216 U. S. App. D. C. 329, 333–334, 670 F. 2d 1148, 1152–1153 (1981); *United States* v. *Gomez*, 633 F. 2d 999, 1007–1008 (CA2 1980), cert. denied, 450 U. S. 994 (1981); *United States* v. *Vasquez*, 534 F. 2d 1142, 1145–1146 (CA5), cert. denied, 429 U. S. 979 (1976); *People* v. *Amick*, 36 Cal. App. 3d 140, 144–145, 111 Cal. Rptr. 280, 282–283 (1973); *People* v. *Holdman*, 73 Ill. 2d 213, 221–222, 383 N. E. 2d 155, 158–159 (1978), cert. denied, 440 U. S. 938 (1979); *Commonwealth* v. *Ortiz*, 376 Mass. 349, 353–354, 380 N. E. 2d 669, 673 (1978); *People* v. *Kreichman*, 37 N. Y. 2d 693, 698–699, 339 N. E. 2d 182, 187–188 (1975) (attempt to stop vehicle on reasonable suspicion, followed by 14-block chase, created probable cause); *Commonwealth* v. *Dennis*, 236 Pa. Super. 348, 351, 344 A. 2d 713, 715 (1975).

[3] "Were it otherwise, 'anyone who does not desire to talk to the police and who either walks or runs away from them would always be subject to legal arrest,' which can hardly 'be countenanced under the Fourth and Fourteenth Amendments.'" 1 LaFave, *supra*, at 669, quoting *United States* v. *Margeson*, 259 F. Supp. 256, 265 (ED Pa. 1966).

[4] Compare *Wong Sun* v. *United States*, 371 U. S. 471, 482 (1963) ("[W]hen an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight from the door must be regarded as ambiguous conduct"), with *People* v. *Amick*, *supra*, at 145, 111 Cal. Rptr., at 283

however, the Court accepts the questionable premise that the officers already had reasonable suspicion when they decided to stop the vehicles,[5] and it boldly concludes that Sharpe and Savage "started speeding" at Thrasher's approach, that Savage "sought to elude the police" when Thrasher attempted the stop, and that Savage took "evasive actions." *Ante,* at 683, n. 3, 688.

Thus if the facts were as the Court describes them, I would be inclined to view this as a probable-cause detention, and the reasonableness of these stops under *Terry* would not appear to be before us. The Court's failure even to consider this question of probable cause is baffling, but ultimately in keeping with its recent practice in *Terry* cases of reaching out far beyond what is required to resolve the cases at hand so as more immediately to impose its views without the bother of abiding by the necessarily gradual pace of case-by-case decisionmaking. See, *e. g., United States* v. *Place,* 462 U. S., at 711, 714–720 (BRENNAN, J., concurring in result); *Florida* v. *Royer,* 460 U. S., at 509, 511, n. (BRENNAN, J., concurring in result).

## II

The Court's opinion is flawed in another critical respect: its discussion of Savage's purported attempt "to elude the police" amounts to nothing more than a *de novo* factual finding made on a record that is, at best, hopelessly ambiguous. Neither the District Court nor the Court of Appeals ever found that Savage's actions constituted evasion or flight. If we are nevertheless to engage in *de novo* factfinding, I

---

("[The police] had a right to and did assume that at that time [the driver and his passengers] knew law enforcement officials wanted to talk to them; and upon being pursued by the black and white unit and Officer Kapphahn with red spotlight and siren there could be little doubt that [the occupants] knew they were being pursued by officers although they failed to stop and continued for a quarter of a mile until they were forced to stop").

[5] See n. 9, *infra.*

submit the Court has taken insufficient account of several factors.

First, Savage's actions in continuing to drive down the highway could well have been entirely consistent with those of any driver who sees the police hail someone in front of him over to the side of the road.  Sharpe's Pontiac was at least several car lengths in front of Savage's pickup truck; Thrasher thought there was a separation of "a car length or two," while Cooke testified that the distance was anywhere from between 30–50 and 100–150 feet.  3 Record 65; 4 *id.*, at 139.  Approaching in the far-left lane, Thrasher pulled even with Sharpe's lead vehicle, "turned the blue light on," "blew the siren," and "motioned for *him* to pull over."  *Id.*, at 145 (emphasis added).  Savage moved into the right lane so as to avoid hitting Thrasher, who was slowing along with Sharpe, and continued on his way.  Neither Cooke nor Thrasher ever testified that Savage "sought to elude" them, and there is nothing here that is necessarily inconsistent with the actions of any motorist who happens to be behind a vehicle that is being pulled over to the side of the road.

This view of the record is strongly reinforced by Thrasher's inability on the stand to give a responsive answer to the question: "Would you say the pickup truck was attempting to allude *[sic]* you or just passed you by thinking you had stopped the car?"  3 *id.*, at 84.  Thrasher replied with the nonanswer that "[w]ell, I was across . . . partially in two lanes and he got by me in the other lane," *ibid.*—an observation that could be made about any motorist driving by a stop-in-progress.

Finally, the "[f]ail[ure] to stop [a] motor vehicle when signaled by [a] law-enforcement vehicle" is an independent traffic violation in South Carolina.[6]  Thrasher testified that

---

[6] South Carolina Code § 56–5–750 (1976) provides: "It shall be unlawful for any motor vehicle driver, while driving on any road, street or highway of the State, to fail to stop when signaled by any law-enforcement vehicle by means of a siren or flashing light.  Any attempt to increase the speed of a vehicle or in other manner avoid the pursuing law-enforcement vehicle

Savage was guilty of a number of traffic violations, and when asked to specify what these violations were he enumerated that (1) Savage had been speeding through the campground, and (2) the pickup truck had improper license tags. *Id.*, at 94–95, 99. If Savage in fact had been signaled to stop his truck and had taken "evasive actions" and "sought to elude the police," *ante*, at 688, I find it curious that Thrasher did not include these actions in his litany of Savage's traffic offenses.

None of these factors, singularly or together, show beyond a doubt that Savage proceeded innocently past the stop of Sharpe. But given that it is the Government's burden to prove facts justifying the duration of the investigative detention, *Florida* v. *Royer, supra*, at 500 (opinion of WHITE, J.), and given that the courts below never found that Savage "sought to elude" the authorities,[7] the Court's conclusion to the contrary is extremely disturbing. I do not believe that citizens should be deemed to have forfeited important Fourth Amendment safeguards on the basis of a cold record as ambiguous as the one before us. Today's opinion unfortunately is representative of a growing number of instances in which the Court is willing to make *de novo* factual findings in criminal cases where convenient to support its decisions.[8] Even if the Court had the time and inclination to engage in the "con-

---

when signaled by a siren or flashing light shall constitute prima facie evidence of a violation of this section. . . ."

[7] The Court of Appeals did not discuss this issue one way or the other. The closest that the District Court came to passing on the question was an ambiguous statement during a colloquy that the stop "took a little longer than it should have taken. They created their own problem." 4 Record 221. The court's reference to "they" arguably could have been to Sharpe and Savage, but such a construction is tenuous given the court's previous comment that the stop took longer "than it *should* have taken"—which seems to be addressed to the actions of the officers. The Government quite properly has never sought to distill from this ambiguous remark a "finding" that Savage took "evasive actions" or "sought to elude the police."

[8] See, *e. g.*, *Oregon* v. *Elstad, ante*, at 360–362 (BRENNAN, J., dissenting); *United States* v. *Young, ante*, at 30–35 (BRENNAN, J., concurring in

scientious and detailed examination of the record" required in fairly making purely factual judgments of this sort, *United States* v. *Hasting,* 461 U. S. 499, 517 (1983) (STEVENS, J., concurring in judgment), such exercises of our authority would nevertheless be improper. The Court's institutional role in this context should be focused on resolving "important questions of federal law" and on "ensuring clarity and uniformity of legal doctrine," *United States* v. *Young, ante,* at 34 (BRENNAN, J., concurring in part and dissenting in part), rather than on serving as the prosecution's factfinder of last resort.[9]

---

part and dissenting in part); *United States* v. *Hasting,* 461 U. S. 499, 516–519 (1983) (STEVENS, J., concurring in judgment).

[9] Like JUSTICE MARSHALL, *ante,* at 700–702 (concurring in judgment), I cannot understand why the Court feels compelled to decide that the District Court's finding of reasonable suspicion "is abundantly supported by the record," *ante,* at 682. The Court of Appeals merely assumed that the reasonable-suspicion finding was proper for the sake of analysis, 660 F. 2d 967, 970 (CA4 1981), and the question was not presented for our consideration. The District Court considered the issue "a real close question," emphasized its "great reluctance" on the merits, and found that the Government had barely established reasonable suspicion "by the greater weight of the evidence" but that it had not shown sufficient suspicion beyond a reasonable doubt. 5 Record 152–155, 190.

The Court has taken insufficient account of several factors. First, these detentions were little more than "profile stops" similar to numerous stops of campers and recreational vehicles carried out by the DEA in the general area on the day in question; none of these other questionable profile stops turned up any evidence of wrongdoing. 4 *id.,* at 126–127, 190. See also 3 *id.,* at 70–71 (DEA "set up roadblocks in that particular area and did stop a number of vehicles with roadblocks"). Second, there is nothing in the record to support the Court's assertion that Sharpe and Savage "started speeding as soon as Officer Thrasher began following them in his marked car." *Ante,* at 683, n. 3; see *ante,* at 701 (MARSHALL, J., concurring in judgment). To the extent the Court suggests that they were attempting to speed away at Thrasher's approach, this factual finding is inconsistent with Thrasher's concession that Sharpe and Savage *stopped* at every stop sign and traffic light they encountered—lawful conduct that hardly comports with notions of a high-speed attempt to elude the authorities. 4

## III

## A

Because it has not been shown that Savage "sought to elude" the police, I agree with the Court that the constitutional propriety of these detentions is governed by *Terry* and its progeny. These precedents lead inexorably to the conclusion that the investigative actions at issue here violated the Fourth Amendment. As the Fourth Circuit emphasized, the lengthy detentions of Sharpe and Savage did not accord with *Terry*'s threshold brevity requirement. 660 F. 2d 967, 970 (1981).[10] But even if the length of these detentions did not *alone* compel affirmance of the Fourth Circuit's judgment, the Court today has evaded a further requirement of our *Terry* precedents: that "the investigative methods employed should be the least intrusive means reasonably available to

_____

Record 142–143. Finally, it appears strongly that the reason these profile stops were made when they were was *not* because Cooke's "reasonable" suspicions had hardened, but because he was about to run out of gas. See Defendant's Ex. 1, pp. 4–5 (Cooke's discussion with Thrasher over police radio) ("We're going to have to do it pretty quick or I'll have to go 10–7 for gas. . . . You want to just try to run them into there? I'd like to take the Pontiac in there with it, I don't have anything to go on on it other than just normal suspicion. I'd like to at least I.D. the driver and passenger in that"). As the District Court perceptively observed, "[i]t's possibly *[sic]* the very basic reason for stopping them was because Mr. Cooke was about to run out of gas." 5 Record 52.

[10] The Fourth Circuit held that "the length of the detentions effectively transformed them into de facto arrests without bases in probable cause, unreasonable seizures under the Fourth Amendment." 660 F. 2d, at 970. Officer Thrasher himself conceded that Savage was under "custodial arrest" during the entire stop. 4 Record 165. Far from being merely "the brief and narrowly circumscribed intrusions" authorized by the *Terry* line of authority, the detentions here were "in important respects indistinguishable from a traditional arrest," and "any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway* v. *New York*, 442 U. S. 200, 212–213 (1979). See also *ante*, at 696–698 (MARSHALL, J., concurring in judgment).

verify or dispel the officer's suspicion in a short period of time," and that the Government bears the burden of demonstrating that it was objectively infeasible to investigate "in a more expeditious way." *Florida* v. *Royer*, 460 U. S., at 500, 505 (opinion of WHITE, J.).[11] The record before us demonstrates that, for at least four reasons, the Government has not carried this burden.

*First.* Assuming that Savage did not break away from the officers by taking "evasive actions" to "elude" them—in which instance this is not a *Terry* case at all—the Government has not demonstrated why two trained law enforcement officers driving in separate vehicles, both equipped with flashing lights,[12] could not have carried out a stop of a Pontiac and a pickup truck in such a manner as to ensure that both vehicles would be stopped together. Reasonable methods for bringing about the proximate stop of two vehicles readily come to mind; such methods would have been particularly important if, as the Court assumes, both officers knew that only Cooke was capable of carrying out the investigation.

*Second.* If the officers believed that the suspected marihuana was in Savage's pickup truck, and if only Cooke was capable of investigating for the presence of marihuana, I am at a loss why Cooke did not follow the truck and leave Thrasher with the Pontiac, rather than vice versa.[13]

---

[11] As I have previously argued, I do not believe that "the absence of a less intrusive means can make an otherwise unreasonable stop reasonable." *Florida* v. *Royer*, 460 U. S., at 511, n. (concurring in result). See also n. 1, *supra*.

[12] Thrasher was driving a marked police car, and Cooke's unmarked vehicle carried a portable flashing light that could be attached to the dash. See 4 Record 54.

[13] On the stand, the officers disagreed as to which one of them was responsible for this questionable decision. Cooke, supposedly the officer in charge, insisted that "Thrasher told me to get the Pontiac." *Ibid.* Thrasher, on the other hand, maintained that "Cooke said he would stay with the Pontiac." *Id.*, at 145. The Conway Highway Patrol Dispatch Communications transcript demonstrates that Thrasher told Cooke to "[t]ake the Pontiac, I'll get the truck." Defendant's Ex. 1, p. 5.

*Third.* The Government has offered no plausible explanation why Thrasher, a trained South Carolina highway patrolman, could not have carried out the limited *Terry* investigation of Savage and the pickup truck. Here again, however, the Court makes a bold *de novo* factual finding to the contrary:

> "It was appropriate for Officer Thrasher to hold Savage for the brief period pending Cooke's arrival. Thrasher could not be certain that he was aware of all of the facts that had aroused Cooke's suspicions; and, as a highway patrolman, he lacked Cooke's training and experience in dealing with narcotics investigations." *Ante,* at 687, n. 5.

The record wholly undermines the Court's conclusion. Far from being unaware of what was going on, Thrasher had conversed with Cooke by radio while they were following the vehicles and had fully discussed the various factors that might justify an investigative stop.[14] Cooke sought out Thrasher's "professional opinion" on the situation, and it was *Thrasher* who ultimately made the determination that they properly could stop the vehicles.[15] Thrasher's "professional opinion" was that, based on what Cooke had told him and his own observations, the truck "might be loaded" with marihuana.[16] Once he had stopped Savage, Thrasher

---

[14] See, *e. g., id.,* at 3–4 (transcription of police-band exchanges) (discussing known offloading of marihuana during the night, vehicles' movements, and appearance of vehicles); 4 Record 50 (Cooke "conversed with Mr. Thrasher and attempted to tell him what I had encountered, where I had been"); *id.,* at 52–53, 159–161.

[15] Cooke asked: "What's your professional opinion of the way that truck's riding?" Thrasher responded: "He's loaded. He's got a load in there of something." Cooke replied: "Is that enough reason for you to stop him?" Thrasher answered: "Affirmative . . . Just say the word and I'll . . . ." Defendant's Ex. 1, p. 4. See also 4 Record 52–53.

[16] 3 *id.,* at 87 (Thrasher "suspected that [the truck] may have marihuana in it" because "the camper windows were covered" with quilts and camper appeared to be overloaded); 4 *id.,* at 160–161 (Thrasher knew the truck was suspected of carrying marihuana).

not only "held" him, but carried out his own investigation of the situation. He pointed out that the truck had been riding low and asked Savage what was inside. He inspected the exterior and even jumped up on the bumper to test how loaded down the camper might be. 3 Record 87; 4 *id.*, at 150. Moreover, although Cooke certainly had more drug enforcement experience than Thrasher, there is no reason why Thrasher could not have conducted the simple sniffing investigation that Cooke later did: Thrasher, like all South Carolina highway patrolmen, had received basic narcotics detection training and knew exactly what marihuana smells like. 3 *id.*, at 86.[17] He did not even attempt to smell the windows of the camper shell for two reasons: first, that was not his assigned "job"; and second, "[m]y sinuses were stopped up that morning." 4 *id.*, at 164, 178; see also 3 *id.*, at 101.[18] Thrasher's sinuses apparently cleared up several hours later, however, because once the pickup was at the police station he decided, "[j]ust as a matter of curiosity," to "get right up on the window" of the vehicle, and reported decisively that "I smelled some marijuana up around the windows." *Ibid.* I would have thought that, before the Court chose to uphold a lengthy detention of a citizen without

---

[17] The Fourth Circuit assumed without deciding that "the odor of raw marijuana may provide probable cause to search a vehicle legitimately stopped." 660 F. 2d, at 971. As JUSTICE MARSHALL notes, "[n]o question is presented [in this case] as to whether odor that creates probable cause also justifies a warrantless search." *Ante*, at 699, n. 12 (concurring in judgment). See *United States* v. *Johns*, 469 U. S. 478, 489 (1985) (BRENNAN, J., dissenting).

[18] After Cooke claimed to have smelled the marijuana, Savage asked for Thrasher's opinion. See 4 Record 177 ("Q. Don't you remember . . . Don Savage saying [to Cooke] you don't smell any marijuana, let's get a second opinion from this officer here, don't you remember that, talking about you, getting your second opinion? A. Yes, sir, I believe he might have"). Thrasher could not recall why he did not follow through on the request. *Id.*, at 177–178.

probable cause based on the "reasonable" ignorance of the detaining officer, it would have taken the time to get its facts straight.[19]

*Finally.* The record strongly suggests that the delay may have been attributable in large measure to the poor investigative coordination and botched communications on the part of the DEA. Drug enforcement agents were swarming throughout the immediate area on the morning that Savage and Sharpe were detained, conducting numerous roadblocks and "profile stops" of campers and recreational vehicles similar to Savage's. See n. 9, *supra.* Even accepting the Court's dubious premise that a highway patrolman is somehow incapable of carrying out a simple investigative stop, it is clear that Cooke had followed Sharpe and Savage for over 30 minutes and, knowing that a multiple-vehicle stop was in the offing, should have obtained assistance from other DEA agents. This was, in fact, precisely what he attempted to do. He repeatedly tried to contact the area DEA headquarters but complained over his police radio that "I can't raise anybody else right now." Defendant's Ex. 1, p. 3 (police-

---

[19] The Court has responded by insisting that Thrasher "could not be certain that he was aware" of all the facts and therefore was justified in detaining Savage indefinitely. *Ante,* at 687, n. 5. The Court has not pointed to anything that would support this bald *de novo* finding, which is squarely contradicted by the record. See *supra,* at 713–714. In addition, the Court's reasoning flies directly in the face of the Fourth Amendment, which requires the authorities to ground their conduct on what is known at the time of their actions rather than on what might subsequently turn up. See, *e. g., Henry* v. *United States,* 361 U. S. 98, 103 (1959) ("An arrest is not justified by what the subsequent search discloses"); *Johnson* v. *United States,* 333 U. S. 10, 17 (1948). The Court's unprecedented suggestion to the contrary threatens to "obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." *Ibid.* It is enough here that Thrasher possessed whatever reasonable suspicion Cooke did and was fully in the position to conduct the sniffing investigation that Cooke later undertook.

band transcription). He asked the local police dispatcher to telephone the DEA office to "ask them if anybody there has any contact with me on my DEA frequency." *Id.*, at 4. The dispatcher reported that the line was busy; local police units had to be sent out to headquarters "to tell these people to get off the telephone." *Id.*, at 6. Once the units arrived, it was learned that "[t]here's no one there. They're all down at the Mar Vista Motel." *Ibid.* Additional units had to be sent to the motel to "get those people out of the sack." *Ibid.* Agents apparently were eventually located at the motel and at Don's Pancake House, *ibid.*, for by the time that Cooke returned to the Pontiac to complete the arrests there were several other DEA agents waiting to assist him, 4 Record 171–172. In the meantime, of course, Cooke had had to request Thrasher as a local backup.

Far from demonstrating that these investigative stops were carried out in the most "expeditious way" using all "reasonably available" investigative methods, *Florida* v. *Royer*, 460 U. S., at 500, 505 (opinion of WHITE, J.), the record in this case therefore strongly suggests custodial detentions more accurately characterized as resulting from hopelessly bungled communications and from Thrasher's unwillingness to tread on Cooke's investigative turf. I do not mean to suggest that Cooke and Thrasher bore the entire blame for these delays; it was not Cooke's fault that his DEA backups apparently were sleeping or eating breakfast rather than monitoring their radios for his calls, and Thrasher might well have felt that it was not his place to carry out an investigation he apparently was fully capable of conducting. But constitutional rights should not so easily be balanced away simply because the individual officers may have subjectively been acting in good faith, especially where an objective evaluation of the facts suggests an unnecessarily intrusive exercise of police power.[20]

---

[20] In response to this dissent, the Court offers several justifications for its failure to consult the record in making its *de novo* factual determina-

## B

We must remember the Fourth Amendment values at stake here. The Framers understood that "[u]ncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government," and that "[a]mong deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart." *Brinegar* v. *United States,* 338 U. S. 160, 180 (1949) (Jackson, J., dissenting). The Framers accordingly provided that individuals shall be arrested and detained only on probable cause—a standard with "roots that are deep in our history," *Henry* v. *United States,* 361 U. S., at 100, and grounded on "a practical, nontechnical conception affording the best compromise that has been found for accommodating" the "often opposing" interests of effective law enforcement and individual rights, *Brinegar* v. *United States,* *supra,* at 176. By requiring that arrests be made only on probable cause, the Framers sought to preclude custodial

---

tions. First, the Court asserts that judges "should not indulge in unrealistic second-guessing" of police conduct. *Ante,* at 686. There is nothing "unrealistic" about requiring police officers to pursue the "least intrusive means reasonably available" when detaining citizens on less than probable cause, *Florida* v. *Royer,* 460 U. S., at 500 (opinion of WHITE, J.), and it is the *duty* of courts in every Fourth Amendment case to determine whether police conduct satisfied constitutional standards. Moreover, the public will understandably be perplexed why the Court ignores the record and refuses to engage in "second-guessing" where police conduct is challenged while it simultaneously engages in second-guessing of a defendant's conduct where necessary to ensure a verdict for the Government.

In addition, the Court attempts to slip into a footnote the astonishing assertion that *even if its textual discussion of Savage's actions is completely untrue,* this "would not alter our analysis or our conclusion." *Ante,* at 688, n. 6 (emphasis added). The Court contends that, *"whether innocent* or purposeful," *Savage's* conduct "made . . . necessary" the length of these detentions. *Ibid.* (emphasis added). If the authorities did not reasonably carry out the stops, however, and if Savage's continued driving was "innocent" conduct, *ibid.,* it is logically and constitutionally intolerable to hold that Savage waived important Fourth Amendment rights because the events were his "innocent" fault.

detentions resulting solely from "common rumor or report, suspicion, or even 'strong reason to suspect.'" *Henry* v. *United States, supra,* at 101. *Terry* and its progeny depart from the probable-cause safeguard, but only because the sorts of limited intrusions wrought by such encounters fall "far short of the kind of intrusion associated with an arrest." *Dunaway* v. *New York,* 442 U. S. 200, 212 (1979). Detaining officers therefore may *briefly* question individuals and "ask them to explain suspicious circumstances, but any *further detention* or search must be based on consent or probable cause." *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 882 (1975) (emphasis added).

*Terry*'s brevity requirement thus functions as an important constitutional safeguard that prevents an investigative stop from being transformed into a custodial detention merely because "the law enforcement purposes to be served by the stop" are considered important. *Ante,* at 685. Absent a rigorously enforced brevity requirement, the *Terry* rationale "would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway* v. *New York, supra,* at 212–213. As JUSTICE MARSHALL cogently discusses today, the brevity requirement also serves to compel law enforcement agencies to "structure their *Terry* encounters" by employing the resources and methods necessary to "minimize the intrusions worked by these encounters." *Ante,* at 693 (concurring in judgment). Similarly, *Royer*'s requirement that the prosecution demonstrate that the *Terry* stop was carried out in the most "expeditious way" using all "reasonably available" investigative methods, 460 U. S., at 500, 505 (opinion of WHITE, J.), operates to ensure that law enforcement agencies commit the manpower, training, and resources necessary to guarantee that investigative detentions are carried out in the least intrusive manner possible. Some may protest that such requirements impede unduly on law enforcement, but surely these are reasonable tradeoffs for the authority to

seize and detain citizens on less than probable cause. And while it may be tempting to relax these requirements when a defendant is believed to be guilty, the standards we prescribe for the guilty define the authority of the police in detaining the innocent as well. Cf. *Brinegar* v. *United States, supra,* at 181 (Jackson, J., dissenting) ("[A] search against Brinegar's car must be regarded as a search of the car of Everyman").

In this connection, I am particularly disturbed by the Court's suggestion that it might be constitutionally reasonable for a highway patrolman to hold a motorist on *Terry* suspicion pending the arrival of an officer with more "training and experience." *Ante,* at 687, n. 5. The Court is of course correct in emphasizing that Cooke was much more expert at drug detection than Thrasher. I can imagine a great many roadside stop situations in which it might make good police sense for the detaining officer to hold the motorist indefinitely without probable cause so that the officer could have an expert interrogator drive out from the city to conduct the "brief" questioning authorized by *Terry,* or so that his more experienced sergeant could be summoned to render a second opinion, or so that a trained narcotics dog owned by the adjacent county could be driven out to sniff around the windows. I can also imagine circumstances where, given the limited number of patrol cars in a community, an officer might prefer to handcuff a person stopped for investigative questioning to a lamppost while the officer responded to an emergency call. All of these actions might be preferable from a law enforcement standpoint. The Framers did not enact the Fourth Amendment to further the investigative powers of the authorities, however, but to curtail them: *Terry*'s exception to the probable-cause safeguard must not be expanded to the point where the constitutionality of a citizen's detention turns only on whether the individual officers were coping as best they could given inadequate training, marginal resources, negligent supervision, or botched communications.

Our precedents require more—the demonstration by the Government that it was infeasible to conduct the training, ensure the smooth communications, and commit the sort of resources that would have minimized the intrusions. *United States* v. *Place,* 462 U. S., at 709–710; *Florida* v. *Royer,* 460 U. S., at 505–506 (opinion of WHITE, J.).

The Court today has evaded these requirements, failed even to acknowledge the evidence of bungling, miscommunication, and reasonable investigative alternatives, and pronounced simply that the individual officers "acted diligently." *Ante,* at 688. Thus the Court has moved a step or two further in what appears to be "an emerging tendency on the part of the Court to convert the *Terry* decision into a general statement that the Fourth Amendment requires only that any seizure be reasonable," *United States* v. *Place, supra,* at 721 (BLACKMUN, J., concurring in judgment)—a balancing process in which the judicial thumb apparently will be planted firmly on the law enforcement side of the scales.[21]

## IV

Justice Douglas, the lone dissenter in *Terry,* warned that "[t]here have been powerful hydraulic pressures throughout our history that bear heavily on the Court to water down constitutional guarantees and give the police the upper hand." 392 U. S., at 39. Those hydraulic pressures are readily apparent in the outcome of this case. The Court has eschewed narrow grounds of decision so as to expand the bounds of *Terry;* engaged in questionable *de novo* factfinding in violation of its proper mission; either ignored or misconstrued numerous factors in the record that call into question the reasonableness of these custodial detentions; and evaded the

---

[21] Cf. *United States* v. *Leon,* 468 U. S. 897, 929 (1984) (BRENNAN, J., dissenting) (noting Court's increasing resort to cost/benefit analyses "where the 'costs' of excluding illegally obtained evidence loom to exaggerated heights and where the 'benefits' of such exclusion are made to disappear with a mere wave of the hand").

requirements of squarely governing precedents. This breed of decisionmaking breaches faith with our high constitutional duty "to prevent wholesale intrusions upon the personal security of our citizenry." *Davis* v. *Mississippi*, 394 U. S. 721, 726 (1969). I dissent.

JUSTICE STEVENS, dissenting.

Both respondents are fugitives.[1] Their status raises a procedural question that is of more significance than the merits of the somewhat fact-bound questions that the Government's petition for certiorari presented.[2] The procedural question is important because escapes by persons engaged in

---

[1] The Government's petition for the grant of a writ of certiorari was filed on September 27, 1983; it was granted on June 18, 1984. On May 11, 1984, respondent Sharpe's counsel wrote a letter to the Court. It stated that, "as of this date, Mr. Sharpe is in fugitive status as to charges in the Northern District of Georgia and the State of North Carolina." See Letter of Mark J. Kadish to Alexander Stevas, Clerk of the United States Supreme Court (May 11, 1984). Subsequently, on July 11, 1984, Judge Sol Blatt, Jr., of the United States District Court for the District of South Carolina entered two orders forfeiting the bonds of both respondents. See Motion to Proceed in Forma Pauperis of William Harris Sharpe and Donald Davis Savage, Exhibit B. The Solicitor General states that the United States Attorney's Office has advised the Department of Justice that, "to the best of its knowledge, respondents remain fugitives." Reply Brief for United States 2.

[2] The Government's petition posed the following questions:

"1. Whether law enforcement officers may temporarily detain an individual reasonably suspected of criminal activity for the period—brief, but exceeding a few minutes—reasonably necessary to pursue a circumscribed investigation of the suspected criminal activity.

"2. Whether, assuming that the initial phase of either respondent's detention was unduly extended, the illegality mandates suppression of a large shipment of marijuana which, because of its distinct odor, was discovered immediately thereafter in respondent Savage's vehicle." Pet. for Cert. I. Cf. *Florida* v. *Meyers*, 466 U. S. 380, 385 (1984) *(per curiam)* (STEVENS, J., dissenting) (the Court "should focus [its] attention on methods of using [its] scarce resources wisely rather than laying another course of bricks in the building of a federal judicial bureaucracy").

the lucrative business of smuggling narcotics are apparently not uncommon,[3] and because the fugitive status of the litigants may have an impact on this Court's disposition of the case.

If a defendant escapes, and remains at large while his appeal is pending, the appeal will normally be dismissed.[4] Over a century ago, in *Smith* v. *United States*, 94 U. S. 97 (1876), the Court explained the rationale for this type of disposition:

> "It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render. In this case it is admitted that the plaintiff in error has escaped, and is not within the control of the court below, either actually, by being in custody, or constructively, by being out on bail. If we affirm the judgment, he is not likely to appear to submit to his sentence. If we reverse it and order a new trial, he will appear or not, as he may consider most for his interest. Under such circumstances, we are not inclined to hear and decide what may prove to be only a moot case."[5]

Almost a century later, in *Estelle* v. *Dorrough*, 420 U. S. 534 (1975) *(per curiam)*, we further noted that "[d]isposition by dismissal of pending appeals of escaped prisoners is a long-standing and established principle of American law," and that "[t]his Court itself has long followed the practice of declining

---

[3] See, *e. g.*, *Florida* v. *Rodriguez*, 469 U. S. 1, 2–3 (1984) *(per curiam); United States* v. *Holmes*, 680 F. 2d 1372, 1373 (CA11 1982), cert. denied, 460 U. S. 1015 (1983); *United States* v. *Wood*, 550 F. 2d 435, 437–438 (CA9 1976); *United States* v. *Sperling*, 506 F. 2d 1323, 1345, n. 33 (CA2 1974), cert. denied, 420 U. S. 962 (1975).

[4] *Molinaro* v. *New Jersey*, 396 U.S. 365, 365–366 (1970) *(per curiam)*.

[5] 94 U. S., at 97.

to review the convictions of escaped criminal defendants."[6] In the case now before the Court, the respondents did not become fugitives until after they had prevailed in the Court of Appeals and until after the Government had sought review in this Court.[7] The timing of the escape, however, plainly does not affect this Court's power to base its disposition of the case on the fact that respondents have fled. Nor, in my opinion, at least in a case in which there is no dispute about the fugitives' guilt, should there be any difference in the ultimate disposition of the appeal.

The record establishes that the respondents were apprehended while engaged in a serious and flagrant violation of law. Their appeal to the Court of Appeals was based on a claim that the evidence of their guilt was obtained in an unlawful search; such a claim, even if meritorious, establishes neither a lack of culpability nor any fundamental unfairness in the trial process.[8] It is therefore entirely appropriate to conclude that, as fugitives, these litigants should not be accorded standing to advance their claim on appeal.[9]

As would have been true if they had escaped while their appeal was pending before the Court of Appeals, neither of these litigants "is where he can be made to respond to any

---

[6] 420 U. S., at 537. That case also discussed an opinion issued over five years earlier, *Molinaro* v. *New Jersey, supra.* Regarding that opinion, we wrote:

"Thus, in *Molinaro* v. *New Jersey,* 396 U. S. 365 (1970), we dismissed the appeal of an escaped criminal defendant, stating that no persuasive reason exists to adjudicate the merits of such a case and that an escape 'disentitles the defendant to call upon the resources of the Court for determination of his claims.' *Id.,* at 366." 420 U. S., at 537.

See also *Eisler* v. *United States,* 338 U. S. 189 *(per curiam),* and 338 U. S. 883 (1949); *Bonahan* v. *Nebraska,* 125 U. S. 692 (1887); *Smith* v. *United States,* 94 U. S. 97 (1876); cf. *Allen* v. *Rose,* 419 U. S. 1080 (1974).

[7] See n. 1, *supra.*

[8] Cf. *Stone* v. *Powell,* 428 U. S. 465 (1976).

[9] Cf. *Walder* v. *United States,* 347 U. S. 62, 65 (1954).

judgment we may render."[10]   In my judgment, the Court
of Appeals' conclusion that respondents' appeal to it was
meritorious should make no difference in the ultimate out-
come.   Every application of the *Smith* rule necessarily as-
sumes that an appeal may be meritorious.   Moreover, the
Court of Appeals' ruling in respondents' favor does not
preclude the possibility that this Court will disagree.   In
short, for the purpose of deciding whether the *Smith* rule
applies, I believe the merits of the appeal should be entirely
disregarded.[11]

The Court states, *ante*, at 681, n. 2, that because a "rever-
sal of the Court of Appeals' judgment may lead to the rein-
statement of respondents' convictions, respondents' fugitive
status does not render this case moot."   I agree that the case
is not technically moot.[12]   An escape, however, may compro-
mise the adversary character of the litigation.   The lawyer
for the escapee presumably will have lost contact with his
client; his desire to vindicate a faithless client may be less
than zealous; and, as noted, the Court cannot have its normal
control over one of the parties to the case before it.   The
risk that the adversary process will not function effectively
counsels against deciding the merits of a case of this kind.[13]

The correct disposition of this case, I believe, is to treat
it as though the respondents' escape had mooted the appeal.
If we vacate the judgment of the Court of Appeals, and if
we direct that the appeal from the judgment of the District

---

[10] *Smith* v. *United States*, 94 U. S., at 97.

[11] The Government disagrees.   It proposes that the Court reverse the
judgment of the Court of Appeals if we disagree on the merits; however,
if we agree with the Court of Appeals on the merits, the Government
states that we "should vacate the judgment of the court of appeals and
remand the case to that court with directions to dismiss the appeals with
prejudice."   Reply Brief for United States 6–7.   The Court has not ex-
pressly endorsed the Government's "heads I win, tails you lose" position.

[12] See *Molinaro* v. *New Jersey*, 396 U. S., at 366.

[13] See n. 11, *supra*.

Court be dismissed, the consequences would be the same as if the escape had occurred in advance of the Court of Appeals' decision. Moreover, by vacating that court's judgment, the Government's interest in eliminating the precedent that it has challenged in its certiorari petition would be vindicated.[14] Finally, such a disposition would make it unnecessary for this Court to decide the constitutional question that is presented.[15] That, for me, is a matter of paramount importance.[16]

There is one adverse consequence of the disposition I propose. It would deprive the Court of the opportunity to write

[14] Cf. *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39–40 (1950).

[15] *Rescue Army* v. *Municipal Court of Los Angeles*, 331 U. S. 549, 568–574 (1947); *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable"); *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"); *Burton* v. *United States*, 196 U. S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case").

[16] Characteristically, it is a matter the Court simply ignores. See *ante*, at 681–682, n. 2. In *Florida* v. *Rodriguez*, 469 U. S. 1 (1984) *(per curiam)*, on which the Court relies, neither the Court nor the litigants based any argument on the respondent's fugitive status. Moreover, it would have been inappropriate for this Court to vacate the judgment of the Florida court because we have no supervisory power over state courts. Once again, however, the Court has thus overlooked the "important differences between cases that come to us from state tribunals and those that arise in the federal system." *Id.*, at 7 (STEVENS, J., dissenting); see also *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 972 (1984) (STEVENS, J., concurring). The Court's reliance on *United States* v. *Campos-Serrano*, 404 U. S. 293, 294–295, n. 2 (1971), is also misplaced because the point Justice Stewart made for the Court was that the respondent in that case was not a fugitive. In making that point, Justice Stewart implicitly assumed that the doctrine of *Smith* v. *United States*, *supra*, would apply to a case in which the fugitive was the respondent as well as to one in which the fugitive was the petitioner.

an opinion in a Fourth Amendment case. The summary disposition of this case would not serve the interest of providing additional guidance to the law enforcement community. But regarding that interest as paramount would support the wholesale adoption of a practice of rendering advisory opinions at the request of the Executive—a practice the Court abjured at the beginning of our history.[17] We have,

---

[17] See *Hayburn's Case*, 2 Dall. 409 (1792). Following that decision, this Court made clear, after a series of letters, its constitutional practice of not rendering advisory opinions. The correspondences began on July 18, 1793, when Thomas Jefferson, Secretary of State, wrote the following letter to Chief Justice John Jay and Associate Justices:

"GENTLEMEN:

"The war which has taken place among the powers of Europe produces frequent transactions within our ports and limits, on which questions arise of considerable difficulty, and of greater importance to the peace of the United States. Their questions depend for their solution on the construction of our treaties, on the laws of nature and nations, and on the laws of the land, and are often presented under circumstances *which do not give a cognisance of them to the tribunals of the country*. Yet their decision is so little analogous to the ordinary functions of the executive, as to occasion much embarrassment and difficulty to them. The President therefore would be much relieved if he found himself free to refer questions of this description to the opinions of the judges of the Supreme Court of the United States, whose knowledge of the subject would secure us against errors dangerous to the peace of the United States, and their authority insure the respect of all parties. He has therefore asked the attendance of such of the judges as could be collected in time for the occasion, to know, in the first place, their opinion, whether the public may, with propriety, be availed of their *advice on these questions?* And if they may, to present, for their advice, the abstract questions which have already occurred, or may soon occur, from which they will themselves strike out such as any circumstances might, in their opinion, forbid them to pronounce on. I have the honour to be with sentiments of the most perfect respect, gentlemen,

"Your most obedient and humble servant,

"THOS. JEFFERSON"

3 Correspondence and Public Papers of John Jay 486–487 (H. Johnston ed. 1891) (emphasis in original).

Attached with the letter, on behalf of President Washington, were 29 questions. See 33 Writings of George Washington 15–19 (J. Fitzpatrick

instead, opted for a policy of judicial restraint—of studiously avoiding the unnecessary adjudication of constitutional questions. The correct implementation of that policy, I submit,

---

ed. 1940). Two days later, Chief Justice Jay and the Associate Justices penned the following to President Washington:

"SIR:

"We have taken into consideration the letter written to us, by your direction, on the 18th inst., by the Secretary of State. The question, 'whether the public may, with propriety, be availed of the advice of the judges on the questions alluded to,' appears to us to be of much difficulty as well as importance. As it affects the judicial department, we feel a reluctance to decide it without the advice and participation of our absent brethen.

"The occasion which induced our being convened is doubtless urgent; of the degree of that urgency we cannot judge, and consequently cannot propose that the answer to this question be postponed until the sitting of the Supreme Court. We are not only disposed, but desirous, to promote the welfare of our country in every way that may consist with our official duties. We are pleased, sir, with every opportunity of manifesting our respect for you, and are solicitous to do whatever may be in our power to render your administration as easy and agreeable to yourself as it is to our country. If circumstances should forbid further delay, we will immediately resume the consideration of the question, and decide it.

"We have the honour to be, with perfect respect, your most obedient and most humble servants." 3 Correspondence and Public Papers of John Jay 487–488 (Johnston ed. 1891).

President Washington promptly returned a reply:

"Gentlemen: The circumstances, which had induced me to ask your counsel on certain legal questions interesting to the public, exist now as they did then; but I by no means press a decision, whereon you wish the advice and participation of your absent brethen. Whenever, therefore, their presence shall enable you to give it with more satisfaction to yourselves, I shall accept it with pleasure. With sentiments of high respect, I am, &c." 33 Writings of George Washington 28 (J. Fitzpatrick ed. 1940).

Finally, Chief Justice Jay and the Associate Justices returned their response:

"SIR:

"We have considered the previous question stated in a letter written by your direction to us by the Secretary of State on the 18th of last month, [regarding] the lines of separation drawn by the Constitution between the three departments of the government. These being in certain respects

requires that we predicate the disposition of this case on the respondents' fugitive status.

Accordingly, I respectfully dissent.

---

checks upon each other, and our being judges of a court of the last resort, are considerations which afford strong arguments against the propriety of our extra-judicially deciding the questions alluded to, especially as the power given by the Constitution to the President, of calling on the heads of departments for opinions, seems to have been *purposely* as well as expressly united to the *executive* departments.

"We exceedingly regret every event that may cause embarrassment to your administration, but we derive consolation from the reflection that your judgment will discern what is right, and that your usual prudence, decision, and firmness will surmount every obstacle to the preservation of the rights, peace, and dignity of the United States.

"We have the honour to be, with perfect respect, sir, your most obedient and most humble servants." 3 Correspondence and Public Papers of John Jay 488–489 (Johnston ed. 1891) (emphasis in original).