## 77836. DiSANTI v. THE STATE.
(378 SE2d 729)

BIRDSONG, Judge.

Appellant Joseph DiSanti appeals his conviction of trafficking in cocaine and his sentence.

At approximately 11:27 p.m., June 27, 1987, Trooper James Ralston stopped a vehicle driven by appellant for speeding 64 m.p.h. on I-75 in a 55 m.p.h. speed zone. At Ralston's request, appellant produced his Pennsylvania driver's license. Appellant returned to the car and retrieved documents showing his wife's ownership of the Pennsylvania registered vehicle since June 22. At that time, Ralston observed a newspaper from Erie, Pennsylvania, on the right rear floorboard. It was dated Friday, the 26th. Appellant and Ralston engaged in conversation regarding appellant's trip. Ralston asserts he became suspicious that appellant might have contraband in the car. However, he elected to issue appellant a warning ticket for the speeding offense. Before issuing the warning ticket, Ralston decided to ask appellant to consent to a search of his vehicle.

Ralston testified that his suspicions in part were based on his po-

lice experience and the following factors. Appellant said he had been visiting friends, the DiPasquals, in Florida, for a couple of days, but the newspaper from Erie in his car was dated the day earlier. The vehicle was purchased recently; and, appellant was driving it to Florida to test it out, as well as to visit his friends with whom he could not have spent much time. The tape shows appellant mentioned being in the Fort Lauderdale area. Appellant now was on his way to Cleveland, Ohio. Thus, appellant was going from a known drug source area to a major city known for narcotics problems. Appellant was traveling alone and at night. He had left his wife and three children at home with a station wagon. Appellant appeared nervous. He said he owned a tavern and weekends normally are a busy business period for taverns.

At approximately 11:40 to 11:42 p.m., Ralston issued appellant a warning ticket; he had decided not to arrest him for the speeding offense. Ralston returned appellant's driver's license and ownership documents to him. At that point appellant was free to leave, although Ralston did not inform him of this fact.

Shortly after 11:43 p.m. Ralston asked appellant if he would consent to a vehicle search. Appellant verbally consented to the search, after expressing certain strong reservations, including the assertion that nothing was in the car. Appellant reached inside his vehicle and obtained his car keys. Ralston requested appellant to sign a vehicle consent to search form, which he gave to the appellant to read. Appellant appeared to read the form, and questioned the legality of the written consent procedure. The form advised appellant that he could refuse to consent to search. Appellant continued to question the procedure, and approximately two minutes later Ralston orally advised appellant that he need not consent. Ralston also advised appellant that normally people who do not have anything to hide will consent. Appellant refused to sign the form; however, after being advised of his right of refusal, he did not attempt expressly to withdraw his previous oral consent to search.

Less than four minutes from the time he was first requested to consent orally to search, appellant, without being requested to do so, proceeded to unlock the trunk of his car. Ralston observed a suitcase or small bag of clothing in the car and a package wrapped in birthday paper. Appellant appeared to have a limited amount of clothing, enough clothing for a couple of days if that much. Trooper Ralston asked if he could pick up the package, and appellant consented, handing the package to Ralston. Appellant stated that the package was a gift from friends to his daughter and that he did not know its contents. Ralston told appellant that he believed the package felt like it contained cocaine. He based his belief on the weight of the package. Trooper Ralston asked if he could open the package, and appellant

refused permission. Appellant retrieved the package, placed it in the trunk, and shut the trunk lid. Ralston believed at that point appellant had revoked his consent to search, and from that moment on, he considered that appellant was no longer free to go. Appellant became more nervous than before and evasive in his answers. He said Ellen DiPasqual had given him the present for his daughter and that he did not know what was in it. Appellant gave Ralston the DiPasqual's phone number. Ralston subsequently advised him around midnight that he was being *detained* until the drug dog arrived and the information about the package was checked out.

Trooper Ralston continued his investigation. He determined that the DiPasqual phone number had been called and no one answered. From 11:55 p.m. to 12:20 a.m., information was relayed to him from a phone conversation with appellant's wife. Ralston was informed that Mrs. DiSanti stated initially that her husband was in Virginia, and that he had left home on Friday morning after she went to the doctor. When asked about the DiPasquals, she said they had known them for seven or eight years, and that appellant was in Tallahassee with Mrs. DiPasqual visiting the latter's husband who was in prison. Mrs. DiSanti also said appellant was supposed to go to Virginia after leaving Tallahassee. At about 12:20 a.m., Ralston received information from his EPIC check that in 1982 appellant had been arrested for possession of one kilo of cocaine and that he also had a previous rape charge which had been dropped. At about 12:21 a.m., appellant indicated that he wanted to leave to go to the bathroom, but he was not allowed to depart the area. Trooper Ralston had requested a narcotics dog when he initially ran the EPIC check; the dog handler was on a traffic stop at the time and the dog did not arrive on the scene until about 12:37 a.m. At about 12:44 a.m., the dog alerted on the trunk area of the car. Trooper Ralston opened the trunk after appellant declined to do so. At about 12:49 a.m., after cocaine was found in the package, appellant was handcuffed and formally informed that he was under *arrest*.

Trooper Ralston did not believe that he had probable cause to search the package immediately after appellant refused to consent to its search. In fact, at about 11:57 p.m., Ralston appears to have been considering releasing appellant until he could obtain the information he had requested by radio. After 12:20 p.m., when the EPIC information had been received, Ralston believed that he now had probable cause to search the vehicle; and, if he did not have probable cause, from the attendant characteristics and "from the package," he believed he could at least detain appellant until the drug dog arrived. He did not search the vehicle immediately after receiving the EPIC information because he "was waiting on the arrival of the dog to verify any doubt that [he] may have had pertaining to this person or the

vehicle that was stopped." When the trunk initially was opened, Ralston never requested appellant for permission to open anything other than the package. *Held*:

1. Appellant asserts that the trial court erred in holding that the detention for one hour and seventeen minutes was reasonable despite the absence of probable cause, and that the lengthy detention was not based on probable cause and was thus unreasonable.

It is recognized that no "bright line" rule or "rigid time limitations" can be imposed in determining whether detention of a person constitutes a mere investigative stop requiring only an articulable suspicion or an arrest requiring the existence of probable cause at its inception. *United States v. Sharpe*, 470 U. S. 675, 685 (105 SC 1568, 84 LE2d 605); *United States v. Hardy*, 855 F2d 753, 759 (11th Cir. 1988). Nevertheless, this court recently has held that it would stretch the imagination to say that a 30-minute detention was justifiable, under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889), when the officer waited for the arrival of a drug dog and magistrate and the defendant was not free to leave. *Schmidt v. State*, 188 Ga. App. 85, 87 (372 SE2d 440).

In this case, appellant's renewed detention, unrelated to either the speeding offense investigation or his consent to search, commenced at approximately 11:46 p.m. when, after refusing to consent to the search of the package, appellant was no longer free to go. At approximately 11:57 p.m., Trooper Ralston still had not received a response to his EPIC check and was considering whether to release the appellant from detention. In fact, the response to the EPIC check was not relayed to Ralston until about 12:20 a.m. At about 12:21 a.m. appellant indicated he wanted to depart the area as he needed to use a rest room. He was denied permission to leave. The drug dog did not arrive on the scene until approximately 12:44 a.m., about 58 minutes after appellant's renewed detention commenced. Moreover, the record shows that Ralston was aware that the dog handler was on traffic stop when initially contacted. Thus, it was obvious that a substantial delay was likely to be encountered in transporting the drug dog to the scene. Under these circumstances, we find *Schmidt v. State*, supra, to be controlling and that appellant was in a status of arrest. Accordingly, it was necessary for the arrest to be legal that Trooper Ralston have had probable cause to arrest appellant " 'at the moment the arrest [was] made,' " that is at 11:46 p.m. *Schmidt v. State*, supra at 87. In this case, Trooper Ralston had less basis for probable cause *at the moment of arrest* than he did in *Schmidt*. Except for certain characteristics of nervousness, and other minor drug profile factors, the only other significant information Ralston possessed by 11:46 p.m. was a possible discrepancy as to how long appellant had been in Florida due to the date of a newspaper found in his car and a suspicion as to the

contents of a gift-wrapped box due to its weight. While these factors give rise to reasonable and articulable suspicion as to the contents of the package, they do not give rise to probable cause for arrest or search. Accordingly, we find that appellant was placed in unlawful arrest, *Schmidt v. State*, supra, and that the illegal arrest tainted the subsequent search. *Lackey v. State*, 246 Ga. 331 (271 SE2d 478); *Bradshaw v. State*, 162 Ga. App. 750 (1) (293 SE2d 360).

2. In view of our holding in Division 1, we need not address appellant's other enumerations of error.

*Judgment reversed. Banke, P. J., and Beasley, J., concur.*

DECIDED FEBRUARY 15, 1989.

*Bailey & Bearden, J. Lane Bearden, Donald F. Samuel*, for appellant.

*Darrell E. Wilson, District Attorney*, for appellee.