39 F.3d 1178
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
United States of America, Plaintiff-Appellee,
v.
Ojuolape Dowug ADAMS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alexander C. IKEJIANI, Defendant-Appellant.
 Nos. 93-5754, 93-5777.
 United States Court of Appeals, Fourth Circuit.
 Submitted June 14, 1994.
Decided Nov. 4, 1994.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, District Judge. (CR-93-43).
 Gregory William Franklin, Richmond, VA; Duane Gregory Carr, Richmond, VA, for appellants.
 Helen F. Fahey, U.S. Atty., David T. Maguire, Asst. U.S. Atty., Sara E. Heath, Special Assistant United States Attorney, Richmond, VA, for appellee.
 E.D.Va.
 AFFIRMED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Alexander Ikejiani and Ojuolape Adams were charged in a ten-count indictment with various offenses relating to a credit card fraud scheme. The scheme involved the use of stolen credit cards and fraudulent identifications, which were presented to various banks in an effort to receive cash advances on the cards. Adams pled guilty to Count Eight of the indictment, which charged him with bank fraud in connection with his attempt to obtain $2500 in cash from the Union Bank and Trust Company in Ashland, Virginia. At a bench trial, Ikejiani was convicted on five counts of the indictment.
 
 
 2
 Adams and Ikejiani appeal their convictions, arguing that the district court improperly denied their motions to suppress evidence seized in connection with a traffic stop. Additionally, Ikejiani claims that there was insufficient evidence to convict him on Count Three of the indictment, which charged that he obtained $3000 in cash from the Jefferson National Bank in Williamsburg, Virginia, through the fraudulent use of a false driver's license and Visa in the name of Robert Schuller.
 
 I.
 
 3
 Appellants first contend that the warrantless stop of their vehicle violated their fourth amendment rights. They maintain that officers had only a hunch that they had been involved in criminal activity, rather than a particularized, objective basis to believe criminal activity was afoot. Because the stop and ensuing search of the vehicle allegedly violated the Fourth Amendment, Appellants argue that the district court should have granted their motions to suppress the items seized as a result of the stop. This argument is without merit.
 
 
 4
 We review de novo the legal conclusions involved in suppression determinations. Factual determinations informing those legal conclusions are reviewed under the clearly erroneous standard. United States v. Rusher, 966 F.2d 868, 873 (4th Cir.), cert. denied, 61 U.S.L.W. 3285 (U.S.1992).
 
 
 5
 A police officer may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion, based on articulable facts, that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). This Court has elaborated on the Terry standard:
 
 
 6
 The presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect.
 
 
 7
 United States v. Crittendon, 883 F.2d 326, 328 (4th Cir.1989). Reasonable suspicion requires more than a hunch but less than probable cause, Terry v. Ohio, 392 U.S. at 27, and "can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).
 
 
 8
 Although an investigatory stop should be brief, Terry imposes no rigid time limitations. The "investigative detention must be temporary and last no longer than is necessary to effectuate the purposes of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983).
 
 
 9
 Testimony at the suppression hearing revealed that there had been a series of completed and attempted credit card frauds at various banks in the Eastern District of Virginia in December 1992 and January 1993. At approximately 11:30 a.m. on January 28, 1993, Dave Kezar, the assistant manager of the Ashland branch of the Union Bank and Trust Company, received a call from the bank's credit card department in another town. Kezar was told that several black men with Jamaican accents had just attempted at another bank to obtain a large cash advance on a Visa card. The suspicion was that the men were trying to obtain the money illegally.
 
 
 10
 Kezar alerted his tellers. Within fifteen minutes, a black man wearing a knee-length, black or navy overcoat approached teller Judy Shupe's window. The man, who had a Jamaican accent, presented a NationsBank Visa issued to Claude Moore and a North Carolina driver's license in the name of Claude Moore. The man, who actually was Appellant Adams, requested a $2500 cash advance. Shupe informed her branch manager, Jeffrey Boppe, that she suspected that the man at her window was the subject of the alert.
 
 
 11
 Boppe called the manager of the bank's Master Card department for more information about the alleged scam. He learned that a group of three men had been at a Fredericksburg bank trying to obtain a cash advance with a NationsBank Visa card. The card was issued to Claude Moore, and a North Carolina driver's license in Moore's name was presented for identification. The men were riding in a bluish-grey Nissan Maxima.
 
 
 12
 Boppe looked out his window at the employees' parking lot. It was his experience that when there previously had been suspicious occurrences at the bank, the perpetrators often parked in that area. He saw a grey Maxima parked there and noticed two black men in the car.
 
 
 13
 Shupe returned to her window and told her customer that it would take a few more minutes to obtain authorization for the cash advance. The customer said that he did not want to wait, and he left the bank.
 
 
 14
 In the meantime, Boppe had dialed 911 and had told the police that someone who was possibly involved in a credit card fraud was in the bank. He asked that the police come to the bank to check out the situation. During the conversation, Adams left the bank. Boppe informed the dispatcher that the suspect had just left.
 
 
 15
 Michael Nielson, a patrolman with the Ashland Police Department, testified that he was advised at 11:46 of a possible credit card fraud occurring at the bank, and he was directed to respond to the bank. As he headed to the bank, he heard over the radio that the vehicle involved was a grey Maxima with possible New Jersey or North Carolina tags. He thought he had just seen such a car and radioed that he would be heading back in an attempt to locate the car.
 
 
 16
 Other officers joined the search and stopped the car on Interstate 95 at approximately 11:50. The three occupants of the car were asked to exit the car. Ikejiani, the driver, consented to a search of the car. In the back seat, officers found a long, black overcoat. In the coat's pockets were $5000 in cash and a piece of paper with various names and numbers written on it. The car's occupants gave suspicious stories about where they had been and where they were going. For instance, two of the car's occupants denied having been in Ashland. Officers knew this was untrue since the car had been followed from inside Ashland.
 
 
 17
 A deputy went to the bank to obtain more information. He learned that a credit card and driver's license issued to Claude Moore had been presented to Shupe. The deputy relayed this information to officers at the scene of the stop. He then transported Shupe to the scene to see if she could identify the man who represented himself as Claude Moore. Once at the scene, she readily identified Adams as "Moore." Officers looked again at the paper found in the overcoat. They noticed the name "Moore" written on the paper and realized that the numbers were probably credit card numbers. Defendants were handcuffed and taken to police headquarters.
 
 
 18
 The car was towed to the police impound lot, where officers, in accordance with police department policy, conducted an inventory search. It was during that search that officers discovered various credit cards and false driver's licenses secreted in the car. Among the items discovered were a NationsBank Visa issued to Claude Moore.
 
 
 19
 Given the above facts, we conclude that the officers had sufficient facts to create a reasonable suspicion that criminal activity was afoot, thus justifying the initial stop. Officers had been informed of a possible credit card fraud at a bank. They knew that the three suspects were traveling in a grey Maxima with out-of-state tags.
 
 
 20
 Nor was the length of the stop unreasonable. It was reasonable for the officers, in a fast-developing situation, to hold the suspects for approximately forty-five minutes until Shupe could be brought to the scene to attempt to identify the man who had represented himself as Claude Moore. In United States v. Sharpe, 470 U.S. 675 (1985), the Supreme Court stated:
 
 
 21
 In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.
 
 
 22
 Id. at 686-87.
 
 
 23
 Once Shupe identified Adams as "Claude Moore," officers had probable cause to arrest the men. Further, the subsequent inventory search of the car was proper, see Florida v. Wells, 495 U.S. 1, 4-5 (1990); Colorado v. Bertine, 479 U.S. 367, 375 (1987).
 
 
 24
 We accordingly hold that there was no fourth amendment violation. The the district court properly denied the motions to suppress.
 
 II.
 
 25
 Appellant Ikejiani contends that there was insufficient evidence to convict him on Count Three, which charged that on January 27, 1993, he obtained $3000 in cash from the Jefferson National Bank in Williamsburg, Virginia, through the fraudulent use of a Visa and driver's license in the name of Robert Schuller. We disagree.
 
 
 26
 The teller who gave the money to Ikejiani was able only to give a general description of the man who represented himself as Schuller.
 
 
 27
 However, Carmen Lechler, a teller at another bank less than one mile away from the Jefferson National Bank, positively identified Ikejiani as the man who posed as Schuller in an unsuccessful attempt to obtain a $4900 cash advance on a Visa issued to Schuller. That attempt occurred on the same day as the successful fraud at the Jefferson National Bank.
 
 
 28
 In determining the sufficiency of the evidence, this Court reviews the evidence at trial in the light most favorable to the prosecution, Glasser v. United States, 315 U.S. 60, 80 (1942), including all reasonable inferences that can be drawn from that evidence, United States v. Russell, 971 F.2d 1098, 1109 (4th Cir.1992), cert. denied, 61 U.S.L.W. 3479 (U.S.1993). We conclude that there was constitutionally sufficient evidence to convict Ikejiani on Count Three. In light of Lechler's testimony and identification of Ikejiani, it was reasonable for the factfinder to infer that Ikejiani was the same man who fraudulently obtained the cash advance from Jefferson National Bank.
 
 III.
 
 29
 We accordingly affirm the convictions of both Ikejiani and Adams. As our review of the materials before us reveals that it would not significantly aid the decisional process, we dispense with oral argument.
 
 
 30
 AFFIRMED.