**Timothy John SMITH, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–96–00620–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 8, 1997.

Robert A. Monks, Galveston, for Appellant.

Denise V. Wilkerson, Galveston, for Appellee.

Before COHEN, NUCHIA and WILSON, JJ.

## OPINION

NUCHIA, Justice.

Appellant was convicted by a jury of murder and assessed punishment of life in prison. He appeals the trial court's denial of his motion to suppress. We affirm.

## BACKGROUND

On July 11, 1994, the family of Melissa Cavender contacted the Santa Fe Police Department and reported her missing. Melissa's car was located in the parking lot of Lit'l Red's pub, located on Highway 646 near Santa Fe. The Santa Fe Police Department turned it over to the Galveston County Sheriff's Department because the pub was outside their jurisdiction. The investigators assigned to the case—Sergeants Hansen, Tuttoilmondo, and Pruitt—learned from patrons at Red's that Melissa Cavender had last been seen speaking to a man dressed as a rodeo clown. They also learned that shortly after Melissa left, the clown followed. After determining that the clown was appellant, the investigating officers contacted appellant at home. When they arrived at his home late that evening, appellant was standing in the driveway with his girlfriend, Brenda Walleck. The officers identified themselves and asked if they could speak to appellant alone. Appellant agreed to speak to the officers, and Walleck went into the house.

The officers told appellant that they were investigating a missing person report, and, because he had been seen talking to Cavender at Red's, they wanted to know if appellant had any information regarding what might have happened to her. When asked what he had done the night before, appellant told the officers that he worked a rodeo on Sunday, July 10. Appellant said that, after visiting several other bars, he arrived at Red's. Appellant told the officers that he had met a woman at Red's who fit Melissa Cavender's description. Appellant stated that after he unsuccessfully attempted to "pick up" the woman at the bar, she left Red's. Shortly thereafter, appellant said, he went to his home and spent the night with Walleck.

Appellant also told the investigators that they could search his vehicle. Hansen advised appellant that before they searched the vehicle, they would have to obtain his written consent. Before completing any specific information on the consent form, Hansen read the printed language to appellant and asked if he still wanted to offer his consent. When appellant stated that he did still want to allow the officers to search his truck, Hansen filled in the blanks on the form and again read the completed consent form to appellant. After appellant signed the consent form, Hansen and Pruitt began searching appellant's truck. In the open bed, Hansen noticed a clump of hair under a tire tool. The tire tool also had what appeared to be clumps of hair stuck to it. Unsure as to what type of hair it was,[1] the officers collected a sample of the hair, and discontinued

---

1. It was later determined that the hair sample collected was similar in DNA composition and microscopic properties to that of the victim.

their inspection in order to obtain a search warrant.

The officers then asked appellant to accompany them to the Santa Fe police station in order to give a statement, and appellant voluntarily agreed to do so. At the request of the officers, Walleck also agreed to go to the police station and provide a statement.

At the Santa Fe police station, after receiving his *Miranda* warnings from Hansen, appellant voluntarily gave the officers a written statement. The statement—which was typed by Hansen—contained written *Miranda* warnings in accordance with TEX.CODE CRIM.P.ANN. art. 38.22 (Vernon 1981); each of the warnings was initialed by appellant. Pruitt read the complete statement to appellant, and appellant was given an opportunity to read the statement again before he signed it.

After the statements of appellant and Walleck were complete, the officers noticed some discrepancies between the two statements. When confronted with these discrepancies, appellant admitted to Hansen and Pruitt that he had asked Walleck to lie for him. Hansen asked appellant if he killed Melissa Cavender, and appellant told the officers that he was too intoxicated the night before, and he did not remember if he killed the victim. When the officers told appellant that they wanted to find Melissa Cavender so they could help her if she needed help or find her body if she was dead, appellant said that he was having a "vision" of a location where the victim might be found. The "vision" was of a rural area near a gate.

Based on appellant's description of his "vision," the officers concluded that he was describing an area near the Hall's Bayou Ranch or the Kiddo Tacquard Ranch in Galveston County. When the officers decided to look near those areas for the victim, appellant volunteered to go with them. Appellant and the officers left the police station to search those areas in Hansen's van at approximately 4:30 a.m. Appellant was not handcuffed during the search. With appellant directing the way and attempting to identify each location as that featured in his "vision," the search began in the area around gates near Hall's Bayou. After searching

the Hall's Bayou area, appellant directed them to the Kiddo Tacquard Ranch Road area. Appellant appeared to recognize the area and eventually pointed out a brushy area on the south side of the road. There they found the nude body of Melissa Cavender. She had a fractured skull, and had been strangled until her larynx had fractured. The body was found at 8:10 a.m.—after the officers and appellant had spent approximately three hours and forty minutes searching for the victim.

Before trial, appellant urged two motions: the first sought to exclude all evidence discovered during the search of his vehicle and the second sought to exclude the body and appellant's oral statements leading to its discovery, as well as a videotaped confession appellant gave to the investigators following his arrest. The trial court denied both motions.

## DISCUSSION

In a single point of error, appellant contends the trial court erred in overruling his motions to suppress "the body of the victim and the circumstances surrounding its discovery," because that evidence was obtained during and as the result of an investigative detention which was illegal because it went on too long.

The trial judge, in his findings relative to appellant's motion to suppress, found that there was no detention of appellant prior to the point where appellant was taken to search for the victim. The judge did find that, at that point, the appellant was "under investigative detention" and found that "the investigators had probable cause to detain said defendant for a period of time necessary to either confirm or eliminate the said defendant as a suspect."

A trial court's ruling on a motion to suppress will not be reversed absent an abuse of discretion. *Butler v. State,* 872 S.W.2d 227, 236 (Tex.Crim.App.1994). As the sole finder of fact and arbiter of credibility at the hearing on a pretrial motion, the trial court's findings will not be disturbed on appeal unless they lack support in the record. *Green v. State,* 615 S.W.2d 700, 707 (Tex.Crim.App.

1980). So long as those fact findings are supported by the record, this Court's only inquiry is whether the trial court correctly applied the law to those facts. *Johnson v. State*, 698 S.W.2d 154, 159 (Tex.Crim.App. 1985).

■ Despite the breadth of appellant's motion to suppress, his brief on appeal narrows his argument to a single issue: Did the duration of his investigative detention amount to an unlawful, warrantless arrest, and, therefore, render inadmissible the evidence discovered during the search for the victim's body? For the following reasons, we hold that it did not.

In *Francis v. State*, 896 S.W.2d 406 (Tex. App.—Houston [1st Dist.] 1995, pet. dism'd), this court addressed police-civilian interactions as they range from "friendly exchanges" to arrests. We found it useful to examine each progressive level of police intrusion to determine if it is reasonable under the circumstances based on the information known to the officers at the time rather than focus on a particular segment of the transaction. *Id.* at 411. The intrusion we are dealing with in this case is a temporary investigative detention, rather than an arrest. We note that in this case, although the trial judge used the term "probable cause," his finding clearly is in the language of an analysis of an investigative detention, and, therefore, his finding of "probable cause" was actually a finding of reasonable suspicion, the standard necessary to support an investigative detention.

■ Circumstances short of probable cause to arrest may justify a temporary detention for the purpose of investigation. *See, e.g., Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Daniels v. State*, 718 S.W.2d 702, 704–05 (Tex.Crim.App.1986); *Francis*, 896 S.W.2d at 409. To justify an investigative detention, the officer must have specific articulable facts which, based on his experience and personal knowledge, and coupled with logical inferences from those facts, warrant the intrusion on the detainee. *Joseph v. State*, 865 S.W.2d 100, 102 (Tex.App.—Corpus Christi 1993, pet. ref'd).

■ The constitutional considerations for an investigative detention are 1) whether the detention was too long in duration, 2) whether police officers diligently pursued means of investigation that were likely to confirm or dispel their suspicions quickly, and 3) whether police officers were unreasonable in not recognizing less intrusive alternative means by which their objectives might have been accomplished. *Joseph*, 865 S.W.2d at 102–03.

Although the duration of the investigative detention is a factor to be considered, the passage of time alone is not determinative. *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). We must also look to the law enforcement purposes to be furthered by the detention, and the amount of time reasonably necessary to effectuate those purposes. *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575.

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

*Sharpe*, 470 U.S. at 686, 105 S.Ct. at 1575 (citations omitted); *see Ussery v. State*, 651 S.W.2d 767, 770 (Tex.Crim.App.1983); *Lopez v. State*, 663 S.W.2d 587, 589 (Tex.App.—Houston [1st Dist.] 1983, pet. ref'd).

Here the trial court found that the officers' investigative detention of appellant lasted only as long as was "necessary to either confirm or eliminate [him] as a suspect." This conclusion is abundantly supported by the record. The investigative excursion from the police department into the "bayous and boondocks" of Galveston County was at appellant's own direction.

We agree with the trial court that, under these circumstances, the investigative detention of appellant lasted only as long as was necessary to either confirm or eliminate him

as a suspect. Detention of the suspect was not only the least intrusive manner of conducting this investigation, but the only way the officers could determine if the victim was dead or still alive and in need of help. There was a continuous immediate chain of investigative steps taken from the time appellant indicated a search was necessary to the time the body was found. There were no interruptions indicating other investigative activity or indicating that the continued detention of appellant was unnecessary or unjustified.

As was the case in *Sharpe*, the length of the detention was attributable almost entirely to appellant. The record indicates that, under the direction of appellant, the officers diligently pursued his "vision" in an attempt to locate the victim's body. We find that the detention here was not too long in duration, the officers acted diligently to confirm their suspicions, and a less intrusive alternative means of investigation was not obvious. We hold, therefore, that the trial court did not abuse its discretion in denying appellant's motion to suppress.

We overrule appellant's sole point of error.

We affirm the judgment of the trial court.