# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-15-00510-CR

**Johnnie Lee Wilson, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 391ST JUDICIAL DISTRICT
### NO. D-14-0850-SA, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Johnnie Lee Wilson appeals his conviction for two counts of aggravated robbery, contending that the trial court improperly denied his motion to suppress evidence obtained through his investigative detention and arrest because the police officer detained him without reasonable suspicion, a violation of his constitutional rights. Tex. Code Crim. Proc. 38.23 (evidence obtained by officer in violation of United States or Texas Constitution will not be admitted against accused); *see* U.S. Const. amends. IV, V, VI, XIV; Tex. Const. art. I, §§ 9, 19. We will affirm the trial court's judgment of conviction.

### BACKGROUND

At trial, Carlton Rice and Jennifer Venzor testified that they were awakened by the sounds of their front door being kicked in and their burglar alarm going off, and that shortly thereafter they were confronted by three black males, one of whom repeatedly hit Rice in the head

with a hand gun. Venzor testified that the assailants asked her and Rice "where the money was hidden," began "tearing everything up" looking for money, and then ran out the back and side doors of the home when they were informed by a fourth intruder that the police had arrived. Venzor testified that she recognized one of the assailants as a man she knew as "LJ," who was dating someone she knew. She also testified that the men were wearing all black, plus ski masks and bandanas, and that one of them was wearing black and red. After the assailants fled, Venzor and Rice discovered that Rice's car keys were missing as well as his gold mouth piece ("grill") and approximately $80 in twenties.

Officer Emory McAndrews with the San Angelo Police Department testified that she responded to the call of the burglar alarm and arrived at the home on Volney Street shortly before 2 a.m. Upon Officer McAndrew's arrival, Venzor ran out the front door with her son and informed the officer to hurry because "they are going out the back." Officer McAndrews heard a door slam and the sound of a moving chain-link fence and approached the back of the house, where she observed the back door open and an opening in the chain-link fence. She testified that she went through the opening in the fence and through another residence's back yard with alley access. She did not see anyone in the alley or immediate area and instructed the other responding units that someone had run out the back of the residence in a westward direction and to set up a perimeter a few blocks in that direction.

During the trial, the court took up the issue of appellant's motion to suppress outside the presence of the jury. The State called Sergeant Chris Heronema to testify in response to the motion. Sgt. Heronema testified that he responded to the call of a robbery at the home, arriving at

the scene at approximately 2 a.m. The description he had received was of "black males [] running westbound in the south alley from the location" and that the assailants were dressed in "all black" and were armed. He drove past the home and observed several officers already on the scene and therefore drove around the area trying to locate a suspect. He testified that within a block of the home, he located a black male walking westbound. Sgt. Heronema testified that when he first saw the subject (later identified as appellant), he noticed that appellant was sweating in a manner inconsistent with the temperature and a walking pace. He also noticed that appellant was not wearing black clothing but, rather, gray shorts and a white tank top. Sgt. Heronema testified that he then got out of his vehicle, approached appellant, identified himself, explained that he was speaking to appellant because he was investigating a robbery nearby, and immediately asked to frisk appellant because, as he explained, the assailants had been armed.

The court also viewed a video recording of Sgt. Heronema's stop of appellant during the hearing on appellant's motion to suppress. The video shows that after driving down the street for less than a minute after he left the home, Sgt. Heronema observed appellant walking on the sidewalk and radioed to dispatch to confirm what color clothing the assailants had reportedly worn. The description he received that the assailants wore "dark clothing" did not match the "light clothing" worn by appellant, but nonetheless, Sgt. Heronema got out of his car, greeted appellant ("How's it going, man?"), identified himself, and then asked appellant, "Can I get you to put your hands on top of your head for just a second? And just relax, OK? I'm gonna pat you down real quick." After he patted down appellant, Sgt. Heronema asked appellant, "Can I get you to come step in front of my car? I appreciate it." Sgt. Heronema then asked appellant where he was walking from

3

and, after receiving appellant's response ("my girlfriend's house"), explained that the reason he wanted to talk to him was because he had received a report of an assault or robbery on Volney Street and that it involved "four or five black males, one of them carrying a gun," and that is the reason why he patted down appellant. Appellant responded, "OK."

The video showed that Sgt. Heronema then attempted to obtain appellant's identity and explanation of where he had just walked from by asking more questions, including the location of appellant's girlfriend's house. In the video, Sgt. Heronema asks appellant about some blood on his shorts, which appellant explained as having been from his son "earlier"; a grill that appellant pulled from his pocket ("that's my grill") while unsuccessfully attempting to produce his ID; and some cuts on his hands that appellant could not explain but guessed that they came from when he had fought with his girlfriend just before leaving her house about a half hour earlier. The video also shows appellant removing from his pocket a dark-colored bandana while attempting to locate his ID. The video shows that when Officer Robert Flores arrived as backup a few minutes after Sgt. Heronema made contact with appellant, Sgt. Heronmena asked if appellant would wait for him while he went inside his vehicle to confirm appellant's identify. Inside his vehicle, the video shows Sgt. Heronema discovering through radio contact with other law-enforcement officers that the name appellant had provided Sgt. Heronema ("Roman Jefferson") was false, the detailed information appellant had provided about the location of his girlfriend's home was incorrect, and that other officers had just found a discarded gun and black clothing.

Detective Bobby Elrod and Officer Flores also testified at the hearing on appellant's motion to suppress. Detective Elrod testified that he arrived at appellant's location about three hours

4

after Sgt. Heronema first made contact with him and confirmed appellant's identity from prior acquaintance with him. Detective Elrod also testified that appellant told him that he goes by the nickname "LJ."

At the conclusion of the hearing, the trial court granted appellant's motion in part, ruling that any statements made by appellant after 2:20 a.m. would not be admitted because at that point he was placed into custody without being read his *Miranda* rights. The trial court denied the remainder of the motion and overruled appellant's later objection that the physical evidence seized from appellant when he was arrested—a gold grill, a dark-colored bandana, $80 in twenties, and a lighter—was the result of an illegal search and seizure. Appellant contends that the trial court erred in overruling this portion of his motion to suppress and that all of the evidence against him—his telling Detective Elrod his nickname, his photograph that was taken to be used in a line-up (in which Venzor identified him), the physical evidence seized from him upon his arrest (including the grill and bandana), his clothing that was seized (the blood on his clothing was DNA-matched to Rice's blood), and jail recordings wherein appellant identified himself—was "fruit of the poisonous tree" of his illegal detention and arrest and should have been suppressed.

**DISCUSSION**

"The Fourth Amendment to the United States Constitution permits a warrantless detention of a person, short of a full-blown custodial arrest, if the detention is justified by reasonable suspicion." *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). The Texas Court of Criminal Appeals has further explained the reasonable-suspicion determination:

Reasonable suspicion to detain a person exists if an officer has specific, articulable facts that, combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity. These facts must show some unusual activity, some evidence that connects the detainee to the unusual activity, and some indication that the unusual activity is related to crime. [. . .] A reasonable-suspicion determination requires looking at the totality of the circumstances[,] and reasonable suspicion may exist even if those circumstances standing alone may be just as consistent with innocent activity as with criminal activity.

*Id.* at 273–74.

We review a trial court's ruling on a motion to suppress under a bifurcated standard, giving almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that rely on credibility, and reviewing de novo mixed questions of law and fact that do not depend on the evaluation of credibility and demeanor. *Id.* at 273. Whether the facts known to the officer at the time of the detention amount to reasonable suspicion is a mixed question of fact and law that we review de novo. *Id.* Therefore, we consider the totality of the circumstances surrounding Sgt. Heronema's stop and continued detention of appellant to determine whether he had "reasonable suspicion" to believe that appellant was connected to criminal activity.

Appellant contends that because Sgt. Heronema asked him to place his hands over his head and frisked him immediately upon first contacting him and then asked him to move to the front of his car to speak with him, the stop was an investigative detention (rather than merely an "encounter") from the very start, and that appellant was detained before Sgt. Heronema developed any reasonable suspicion that he was a suspect in the crime. *See Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010) (distinguishing "encounters," which a citizen is free to terminate at any time and is not a seizure triggering constitutional protections, with "investigative detentions" and

6

"arrests," which are seizures subject to constitutional protections). An investigative detention occurs "when a person yields to the police officer's show of authority under a reasonable belief that he is not free to leave." *Id.*; *see also State v. Castleberry*, 332 S.W.3d 460, 467 (Tex. Crim. App. 2011) (in determining whether interaction is encounter or detention, courts must take into account totality of circumstances to determine whether reasonable person would have felt free to ignore police officer's request or to terminate encounter). Examples of circumstances that might indicate a seizure include any physical touching by the officer of the citizen and the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Crain*, 315 S.W.3d at 49. An officer's conduct is a determinative factor in deciding whether an encounter was consensual or a seizure, as are the time, place, and surrounding circumstances of the interaction, such as whether it occurred in daylight in a public place with others nearby or on a deserted street in the middle of the night. *Castleberry*, 332 S.W.3d at 468. There is no bright-line rule to determine when an encounter becomes a seizure. *Id.* at 466–67. We will assume without deciding that it was reasonable for appellant to believe that he could not refuse to answer Sgt. Heronema's questions when, within just seconds of Sgt. Heronema approaching him late at night on an unpopulated street, he was asked to put his hands on his head and then was immediately frisked.

A police officer may briefly stop a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information under the "reasonable suspicion standard" that considers the totality of the circumstances and whether there is an objective basis for the stop. *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987); *see Cotton v. State*, 480 S.W.3d 754, 759 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (where

7

evidence showed that appellant parked car in driveway of stranger's house and walked towards another house where he did not live, was not invited, and where trespassing had just occurred, police officer had reasonable basis to suspect appellant's link to trespass and to stop him for 15-20 minutes to maintain status quo and obtain more information); *Davis v. State*, 783 S.W.2d 313, 315–16 (Tex. App.—Corpus Christi 1990, pet. ref'd, untimely filed) (while responding to burglary alarm late at night, police officer who saw man riding bicycle two blocks from crime scene was justified in maintaining status quo momentarily while obtaining more information). We therefore consider the totality of the circumstances surrounding Sgt. Heronema's stop and initial contact with appellant to determine whether the "reasonable suspicion standard" was met to justify appellant's detention.

Sgt. Heronema encountered appellant within six minutes of a home-invasion robbery, within one block of the crime scene, and in the direction from the home that the assailants had reportedly fled. Sgt. Heronema did not note any other pedestrian traffic in the area at the time (approximately 2:00 a.m.). The four or five assailants were black, as is appellant. Sgt. Heronema observed appellant sweating to a degree consistent with flight and inconsistent with the air temperature and appellant's walking pace. We conclude that these circumstances justify Sgt. Heronema's initial stop of appellant and temporary detention of appellant to identify him and determine whether he might be linked to the robbery.

We also conclude that the evidence supports a determination that Sgt. Heronema's continued investigative detention of appellant, until he was arrested, was reasonable under the circumstances. Within five minutes of his first contact with appellant, Sgt. Heronema noticed blood on appellant's shorts, cuts on appellant's hands consistent with climbing over a chain-link fence, and

8

dust on appellant's clothes. Sgt. Heronema testified that he knew at the time that the assailants had fled through a fence. When Sgt. Heronema asked appellant whether he had any form of identification, appellant reached into his pocket and removed a dark bandana and a gold grille, and Sgt. Heronmena testified that he knew from the initial police description that the assailants had worn black bandanas over their faces. Sgt. Heronmena's continued detention of appellant was reasonable under these circumstances and in light of Sgt. Heronema's testimony and the video that shows that he had been unsuccessful in confirming appellant's identity and prior whereabouts based on the information that appellant had provided him.

Also, within the first half hour after contacting appellant, Sgt. Heronema learned that detectives had found a gun and discarded black clothing, including a black shirt, between the Volney Street house and appellant's location, and that appellant had given Sgt. Heronema false information about his identity and his prior whereabouts. Within this relatively short period of legal investigative detention, probable cause developed for Sgt. Heronema to arrest appellant for the misdemeanor offense of failure to identify based on appellant's own actions. *See Smith v. State*, 945 S.W.2d 343, 346 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (police should not be charged with delays in investigative detentions attributable to suspect's evasive actions). Also within this time frame, Sgt. Heronema learned of new information supporting appellant's probable link to the robbery.

We conclude that based on the totality of the circumstances, there was a reasonable basis for Sgt. Heronema's suspicion that appellant may have been involved in the robbery and assault on Volney Street. While Sgt. Heronema temporarily detained appellant to determine his identity and obtain more information, based on his initial reasonable suspicion, Sgt. Heronema

9

became aware of other facts that led him to conclude that appellant had provided him with false identification, a misdemeanor offense. Accordingly, the trial court did not err in denying in part appellant's motion to suppress by determining that appellant was legally detained and arrested.

## CONCLUSION

Because the trial court did not err in denying in part appellant's motion to suppress, we affirm its judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed: April 13, 2016

Do Not Publish